Chief Judge Funo.
On this appeal—involving an action brought by the estate of the late Ernest Hemingway and his widow against the publisher and author of a book, entitled ‘ ‘ Papa Hemingway ’ ’ — we are called upon to decide, primarily, whether conversations of a gifted and highly regarded writer may become the subject of common-law copyright, even though the speaker himself has not reduced his words to writing.
Hemingway died in 1961. During the last 13 years of his life, a close friendship existed between him and A.E. Hotchner, a younger and far less well-known writer. Hotchner, who met Hemingway in the course of writing articles about him, became a favored drinking and traveling companion of the famous author, a frequent visitor to his home and the adapter of some of his works for motion pictures and television. During these years, Hemingway’s conversation with Hotchner, in which others sometimes took part, was filled with anecdote, reminiscence, literary opinion and revealing comment about actual persons on whom some of Hemingway’s fictional characters were based. Hotchner made careful notes of these conversations soon after they occurred, occasionally recording them on a portable tape recorder.
During Hemingway’s lifetime, Hotchner wrote and published several articles about his friend in which he quoted some of this talk at length. Hemingway, far from objecting to this practice, approved of it. Indeed, the record reveals that other writers also quoted Hemingway’s conversation without any objection from him, evén when he was displeased with the articles themselves.
After Hemingway’s death, Hotchner wrote “ Papa Hemingway,” drawing upon his notes and his recollections, and in 1966 it was published by the defendant Random House. Subtitled “ a personal memoir ”, it is a serious and revealing biographical portrait of the world-renowned writer. Woven through the narrative, and giving the book much of its interest and character, are lengthy quotations from Hemingway’s talk, as noted or remembered by Hotchner. Included also are two chapters on Hemingway’s final illness and suicide in which Hotchner, writing of his friend with obvious feeling and sympathy, refers to events, and even to medical information, to which he was *345 privy as an intimate of the family. Hemingway’s widow, Mary, is mentioned frequently in the book, and is sometimes quoted, but only incidentally.
The complaint, which seeks an injunction and damages, alleges four causes of action. The first three, in which the Estate of Hemingway and his widow join as plaintiffs, are, briefly stated, (1) that “ Papa Hemingway ” consists, in the main, of literary matter composed by Hemingway in which he had a common-law copyright; (2) that publication would constitute an unauthorized appropriation of Hemingway’s work and would compete unfairly with his other literary creations; and (3) that Hotehner wrongfully used material which was imparted to him in the course of a confidential and fiduciary relationship with Hemingway. In the fourth cause of action, Mary Hemingway asserts that the book invades the right to privacy to which she herself is entitled under section 51 of the Civil Bights Law,
The plaintiffs moved for a preliminary injunction. The motion was denied (49 Misc 2d 726, affd. 25 A D 2d 719), and the book was thereafter published. After its publication, the defendants sought and were granted summary judgment dismissing all fonr causes of action. The Appellate Division unanimously affirmed the resulting orders and granted the plaintiffs leave to appeal to this court.
Turning to the first cause of action, we agree with the disposition made below but on a ground more narrow than that articulated by the court at Special Term. It is the position of the plaintiffs (under this count) that Hemingway was entitled to a common-law copyright on the theory that his directly quoted comment, anecdote and opinion were his “ literary creations ”, his “ literary property”, and that the defendant Hotchner’s note-taking only performed the mechanics of recordation. And, in a somewhat different vein, the plaintiffs argue that “ [w]hat for Hemingway was oral one day would be or could become his written manuscript the next day ”, that Ms speech, constituting not just a statement of Ms ideas but the very form in which he conceived and expressed them, was as much the subject of common-law copyright as what he might Mmself have committed to paper.
Common-law copyright is the term applied to an author’s proprietary interest in his literary or artistic creations before *346 they have been made generally available to the public. It enables the author to exercise control over the first publication of his work or to prevent publication entirely—hence, its other name, the “ right of first publication ”. (Chamberlain v. Feldman, 300 N. Y. 135, 139.)[1] No cases deal directly with the question whether it extends to conversational speech and we begin, therefore, with a brief review of some relevant concepts in this area of law.
It must be acknowledged—as the defendants point out— that nearly a century ago our court stated that common-law copyright extended to “ ‘ [ejvery new and innocent product of mental labor which has been embodied in writing, or some other material form ’ ”. (Palmer v. De Witt, 47 N. Y. 532, 537; emphasis supplied.) And, more recently, it has been said that “ an author has no property right in his ideas unless * * * given embodiment in a tangible form.” (O’Brien v. RKO Radio Pictures, 68 F. Supp. 13, 14.) However, as a noted scholar in the field has observed, ‘ ‘ the underlying rationale for common law copyright (i.e., the recognition that a property status should attach to the fruits of intellectual labor) is applicable regardless of whether such labor assumes tangible form ” (Nimmer, Copyright, § 11.1, p. 40). The principle that it is not the tangible embodiment of the author’s work but the creation of the work itself which is protected finds recognition in a number of ways in copyright law.
One example, with some relevance to the problem before us, is the treatment which the law has accorded to personal letters — a kind of half-conversation in written form. Although the paper upon which the letter is written belongs to the recipient, it is the author who has the right to publish them or to prevent their publication. (See Baker v. Libbie, 210 Mass. 599, 605, 606.) In the words of the Massachusetts court in the Baker case (210 Mass., at pp. 605-606), the author’s right “is an interest in the intangible and impalpable thought and the par *347 ticular verbal garments in which it has been clothed.” Nor has speech itself been entirely without protection against reproduction for publication. The public delivery of an address or a lecture or the performance of a play is not deemed a ‘ ‘ publication,” and, accordingly, it does not deprive the author of his common-law copyright in its contents. ( See Ferris v. Frohman, 223 U. S. 424; King v. Mister Maestro, Inc., 224 F. Supp. 101, 106; Palmer v. De Witt, 47 N. Y. 532, 543, supra; see, also, Nimmer, Copyright, § 53, p. 208.)
Letters, however — like plays and public addresses, written or not—have distinct, identifiable boundaries and they are, in most cases, only occasional products. Whatever difficulties attend the formulation of suitable rules for the enforcement of rights in such works (see, e.g., Note, Personal Letters: In Need of a Law of Their Own, 44 Iowa L. Rev. 705), they are relatively manageable. However, conversational speech, the distinctive behavior of man, is quite another matter, and subjecting any part of it to the restraints of common-law copyright presents unique problems.
One such problem — and it was stressed by the court at Special Term (Schweitzer, J.)[2]—is that of avoiding undue restraints on the freedoms of speech and press and, in particular, on the writers of history and of biographical works of the genre of Boswell’s “Life of Johnson”. The safeguarding of essential freedoms in this area is, though, not without its complications. The indispensable right of the press to report on what people have done, or on what has happened to them or on what they have said in public (see Time, Inc. v. Hill, 385 U. S. 374; Curtis Pub. Co. v. Butts, 388 U. S. 130; Associated Press v. Walker, 388 U. S. 130) does not necessarily imply an unbounded freedom to publish whatever they may have said in private conversation, any more than it implies a freedom to copy and publish what people may have put down in primate writings.
*348 Copyright, both common-law and statutory, rests on the assumption that there are forms of expression, limited in kind, to be sure, which should not be divulged to the public without the consent of their author. The purpose, far from being restrictive, is to encourage and protect intellectual labor. (See Note, Copyright: Right to Common Law Copyright in Conversation of a Decedent, 67 Col. L. Rev. 366, 367, commenting on the decision denying the plaintiffs before us a preliminary injunction, 49 Misc 2d 726.) The essential thrust of the First Amendment is to prohibit improper restraints on the voluntary public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet. There is necessarily, and within suitably defined areas, a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.
The rules of common-law copyright assure this freedom in the case of written material. However, speech is now easily captured by electronic devices and, consequently, we should be wary about excluding all possibility of protecting a speaker’s right to decide when his words, uttered in private dialogue, may or may not be published at large. Conceivably, there may be limited and special situations in which an interlocutor brings forth oral statements from another party which both understand to be the unique intellectual product of the principal speaker, a product which would qualify for common-law copyright if such statements were in writing. Concerning such problems, we express no opinion; we do no more than raise the questions, leaving them open for future consideration in cases which may present them more sharply than this one does.
On the appeal before us, the plaintiffs’ claim to common-law copyright may be disposed of more simply and on a more narrow ground.
The defendant Hotchner asserts—without contradiction in the papers before us — that Hemingway never suggested to him or to anyone else that he regarded his conversational remarks to be “ literary creations ” or that he was of a mind to restrict Hotchner’s use of the notes and recordings which Hemingway knew him to be accumulating. On the contrary, as we have *349 already observed, it had become a continuing practice, during Hemingway’s lifetime, for Hotchner to write articles about Hemingway, consisting largely of quotations from the latter’s conversation — and of all of this Hemingway approved. In these circumstances, authority to publish must be implied, thus negativing the reservation of any common-law copyright.
Assuming, without deciding, that in a proper case a common-law copyright in certain limited kinds of spoken dialogue might be recognized, it would, at the very least, be required that the speaker indicate that he intended to mark off the utterance in question from the ordinary stream of speech, that he meant to adopt it as a unique statement and that he wished to exercise control over its publication. In the conventional common-law copyright situation, this indication is afforded by the creation of the manuscript itself. It would have to be evidenced in some other way if protection were ever to be accorded to some forms of conversational dialogue.
Such an indication is, of course, possible in the case of speech. It might, for example, be found in prefatory words or inferred from the circumstances in which the dialogue takes place.[3] Another way of formulating such a rule might be to say that, although, in the case of most intellectual products, the courts are reluctant to find that an author has ‘ ‘ published, ” so as to lose his common-law copyright (see Nimmer, Copyright, § 58.2, pp. 226-228), in the case of conversational speech—because of its unique nature — there should be a presumption that the speaker has not reserved any common-law rights unless the contrary strongly appears. However, we need not carry such speculation further in the present case since the requisite conditions are plainly absent here.
For present purposes, it is enough to observe that Hemingway’s words and conduct, far from making any such reservation, left no doubt of his willingness to permit Hotchner to *350 draw freely on their conversation in writing about him and to publish such material. What we have said disposes of the plaintiffs’ claim both to exclusive and to joint copyright and we need not consider this aspect of the case any further.' It follows, therefore, that the courts below were eminently correct in dismissing the first cause of action.
The second count does no more than put another label on the same allegations as those upon which the first was based. As Justice Schweitzer expressed the thought at Special Term, “ [t]he reasoning which denies [the plaintiffs] protection or recovery on theories of common-law copyright also operates to deny recovery on any theory of unfair competition.” (53 Misc 2d 462, 472.) In point of fact, there is no competition of any kind, unfair or otherwise, shown by the plaintiffs’ affidavits. Hotchner was not competing with Hemingway; the latter’s acquiescence in Hotchner’s practice of writing about him disposes of any such suggestion. There is not a word of proof, nor could there be, that, as alleged, the Hotchner book “ unfairly compete [d] with other literary matter * * * created and written ” by Hemingway. Moreover, the affidavits disclose nothing which resembles the ‘ ‘ palming off ” or other deceitful practice which must be present before an otherwise lawful use of literary material might be stamped as unfair competition. (See Hebrew Pub. Co. v. Scharfstein, 288 N. Y. 374; Flamingo Telefilm Sales v. United Artists Corp., 22 A D 2d 778, 779.) Since State law is sufficient to bar the plaintiffs’ claim under the second cause of action, we have no need to consider the contention of the defendant Random House that the decisions in Sears, Roebuck & Co. v. Stiffel Co. (376 U. S. 225) and Compco Corp. v. Day-Brite Light. (376 U. S. 234) apply to preclude the plaintiffs ’ reliance on a State remedy for unfair competition. (See, also, Cable Vision v. KUTV, Inc., 335 F. 2d 348, 354.)
In their third cause of action, the plaintiffs incorporate all of the allegations of the first, adding to them the charge that the use of Hemingway’s conversations was a breach of a confidential relationship between him and Hotchner. In fact, on this appeal, they claim that the third cause “rests” on the first. Since we have already found the first to be insufficient, *351 we might well dispose of the third without further comment. However, the court at Special Term stated that the disposition of the third count rests not on the question whether the plaintiffs enjoy a common-law property right but solely on the existence of the alleged relationship and concluded that there was “ not a scintilla of proof ” to support the plaintiffs’ allegations. Accordingly, we consider the case, briefly, on that theory.
If the fate of the third cause of action turned on the mere existence of a special relationship of trust between the two men, we would have some doubt that the issue could be disposed of without a trial. However, although there is some uncertainty and conflict in the evidence on this issue, there can be no question that the courts below were right in dismissing this cause of action. Even if it were to be assumed that the plaintiffs’ allegations and proofs pointed to the existence of a confidential relationship between Hemingway and Hotchner for some purposes, there is no indication that that relationship envisaged or had, as its subject matter, the conversations or other material which found their way into “Papa Hemingway.” The confidential relationship, if it did exist, extended only to the negotiation and carrying out of projects for the adaptation of Hemingway’s published books and stories for motion pictures and television. Neither the allegations of the complaint nor the averments in the affidavits go beyond this. There is no showing of any kind that the adaptations were based on Hemingway’s conversations; they were drawn from distinct and completed works to which Hemingway held the copyright. Thus, there is nothing in the affidavits from which a restriction on Hotchner’s right to quote Hemingway’s conversation may be deduced.
The plaintiffs’ reliance on such decisions as Underhill v. Schenck (238 N. Y. 7) and Kirke La Shelle Co. v. Armstrong Co. (263 N. Y. 79) is misplaced. In these cases, involving literary property—as in Meinhard v. Salmon (249 N. Y. 458) involving real property—liability was imposed for faithless dealing in connection with the very subject matter which had originally brought the parties together and which formed the basis of their fiduciary relationship. Quite obviously, the case before us presents no such situation.
*352 The fourth count — in which only Hemingway’s widow asserts a cause of action—is grounded on the claim that the Hotchner book intrudes upon her privacy in violation of section 51 of ^ the Civil Rights Law.[4] The decisions in Time, Inc. v. Hill (385 U. S. 374, supra) and Spahn v. Julian Messner, Inc. (21 N Y 2d 124) dispose of the point and confirm the correctness of the dismissal of this cause of action. Both of those cases establish that, in the light of constitutional guarantees of free speech, section 51 may not be applied to afford recovery to a public figure or in matters of public interest — to quote from Hill (385 U. S., at p. 388) —“in the absence of proof that the defendant published the [item] with knowledge of its falsity or in reckless disregard of the truth.” (See, also, Spahn, 21 N Y 2d, at p, 127.) That Mrs. Hemingway is a public figure and newsworthy, within the meaning of these cases, may not be disputed. Not only is she the widow of a literary figure of world renown, a Nobel Laureate, but she herself has encouraged public attention to her status by writing articles for the popular magazines dealing with her husband and with events in their lives together. As the court aptly noted in Goelet v. Confidential, Inc. (5 A D 2d 226, 228), “ [o]nee a person has sought publicity he cannot at his whim withdraw the events of his life from public scrutiny
With respect to the required proof of falsification, under the doctrine of the Hill and Spahn cases, we need but note that, despite a passing reference to the subject in an affidavit, no serious attempt was made to support such a claim. There was no allegation in the complaint of any misstatement knowingly or recklessly made, and in the proceedings below—as the court at Special Term (Murphy, J.) observed—counsel for the plaintiff appears to have “ conceded ” that no issue was presented as to the existence of “ misstatements, inaccuracies or untruths.” Our study of the papers before us confirms this conclusion.
*353 Nor is there basis for the plaintiff’s further contention that, falsity aside, the description of her feelings and conduct during the time of her husband’s mental illness constitutes !í ‘ so intimate and so unwarranted ’ ” a revelation 161 as to outrage the Community’s notions of decency’” and allow an action for damages. [Time, Inc. v. Hill, 385 U. S. 374, 383, n. 7, supra.) It is enough to say that Hotchner’s sympathetic report of Mrs, Hemingway’s role in her husband’s anguished last months may not he treated as an impermissible revelation or as otherwise offensive to any notion of decency. The brief disclosures to which the. plaintiff points have their proper place in a biographical account of the dissolution and death of a gifted writer.
The plaintiff also urges that section 51 creates a right of action not merely for the invasion of privacy ‘ ‘ for the purposes of trade ’ ’ — the aspect of the statute involved in Mill and Spahn—but also for 11 advertising* purposes”, and she goes on to contend that the circulation of galley proofs of the book by Bandom House to the book reviewers of 16 journals and newspapers amounted to an advertisement of the book in advance of its publication.[5] The statute does, as we noted in Flores v. Mosler Safe Co. (7 N Y 2d 276, 284), render a use for u 1 advertising purposes ’ a separate and distinct violation ” but it is Self-evident, we suggest, that the circulation of proofs of a hook to reviewers may not he considered advertisement within the meaning of section 51. The main purpose and function of hook reviewing is to introduce the author’s work into the stream of public information, the free flow of which is safeguarded by the First and Fourteenth Amendments. A publisher, iu circulating a hook for review, risks unfavorable comment as well as praise; he places the work in the arena of debate. The same reasons which support the author’s freedom to write and publish books require a similar freedom for their circulation, before publication, for comment by reviewers.[6]
*354 In brief, then, it is our conclusion that, since no triable issues have been raised, the courts below very properly dismissed the complaint.
The orders appealed from should be affirmed, with costs.
Judges Burke, Scileppi, Bergan, Keating, Breitel and Jasen concur.
Orders affirmed.

. Although, common-law copyright in an unpublished work lasts indefinitely, it is extinguished immediately upon publication of the work by the author. He must then rely, for his protection, upon Federal statutory copyright. (See Nimmer, Copyright, | 11, pp. 38-42 and ch. 4, p. 183 et seq.) Section 2 of the Copyright Act (U. S. Code, tit. 17) expressly preserves common-law rights in unpublished works against any implication that the field is pre-empted by the Federal statute.

. Another problem — also remarked by the court—is the difficulty of measuring the relative self-sufficiency of any one party’s contributions to a conversation, although it may ibe, in the case of some kinds of dialogue or interview, that the difficulty would not be greater than in deciding other questions of degree, such as plagiarism. (See, e.g., Nichols v. Universal Pictures Corp., 45 F. 2d 119.)

. This was the situation in Jenkins v. News Syndicate Co. (128 Misc. 284). The plaintiff alleged that she had had a conference with a newspaper editor in which she described in detail the proposed content of some articles she was requested to write. Later, she decided not to write them and the newspaper thereupon published an “ interview ” with her, precisely quoting much of her conversation with the editor. The court held that she had stated a cause of action for damages on the theory of common-law copyright.

. Section 51 of the Civil Rights Law reads, in part, as follows: “ Any person whose name * * * is used within this state for advertising purposes or for the purposes of trade without [his] written consent * * * may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name * * * to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use

. Mrs. Hemingway also received a set of galley proofs and, after reading them, asked ike author and publisher to delete eertain passages. They agreed to all of her requests, except the one treating of Hemingway’s illness and death, and the publisher withdrew the orlgiual galleys and replaeed them with revised copies.

. We dimply note that the other arguments urged upon us have been considered and found to be without substance.