**Charles NORMAN, Plaintiff,**

**v.**

**The COLUMBIA BROADCASTING SYS-TEM, INC. and Stephan Chodorov, Defendants.**

**No. 66 Civ. 705.**

United States District Court, S. D. New York.

Oct. 27, 1971.

Shaw, Bernstein, Scheuer, Boyden & Sarnoff, New York City, for plaintiff; John L. Hawkins, New York City, of counsel.

Coudert Brothers, New York City, for defendants; Stephen Sayre Singer, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

This action was brought by plaintiff, Charles Norman ("Norman"), against defendants Columbia Broadcasting System, Inc. ("CBS") and Stephan Chodorov ("Chodorov") for alleged copyright infringement of Norman's biography entitled, "Ezra Pound," by a television show entitled, "In Search of Ezra Pound," broadcast in February and March 1966 in three parts over facilities owned by or affiliated with CBS.

Ezra Pound, a well-known American poet, was a public figure, as conceded by plaintiff.

The defendants arranged and at trial demonstrated visually and audibly the program produced by CBS alleged to infringe plaintiff's biography.

The parties agreed that the script of the program insofar as plaintiff contended there were infringements by defendants was set forth in Plaintiff's Exhibit 3A; that the portions of plaintiff's book thereby infringed were likewise quoted in Exhibit 3A, in parallel columns. The alleged infringing portions are in the first column while the infringed areas of the book are in the second column of this exhibit. Originally there were 148 items of alleged infringement. During the trial items 70, 80, 104, 123, 124 and 125 of the charge, Exhibit 3A, were withdrawn (SM 59, 281–282).[1] Plaintiff makes no claim of

1. Unless otherwise identified, numbers in parentheses refer to pages in the trial transcript.

infringement or other violation against Part III of defendants' program (59).

In the course of the presentation of plaintiff's case the court, upon motion of defendants, dismissed all of such claims *except* items 10, 19, 25, 28, 30, 33, 52, 64, 65, 78, 126, 127, 128 and 138. These dismissals were for various reasons, all clearly appearing in the record. Among these reasons were the following:

1. That plaintiff had himself obtained the material from other authorities.

2. That certain "items" were merely copied from Pound's poems.

3. That the items involved were in the public domain.

4. That the material related to a public figure and that the book was a biography. (See Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 302 (2nd Cir. 1966))

5. In a few other instances the alleged infringement was merely a fair use.

The case was tried to the court, and, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the question of damages was reserved.

After hearing the testimony of the parties, examining the exhibits, pleadings and Proposed Findings of Fact and Conclusions of Law and post-trial memoranda submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The court has jurisdiction of the subject matter and of the defendants CBS and Chodorov.

2. Plaintiff is the author of the allegedly infringed biography, "Ezra Pound," first published in 1960. This biography is the life of the renowned poet, Ezra Pound, and so-called polemicist, admittedly a public figure (22–23, 61, 101–102; Pl.Exs. 4, 5, 6).

3. The Register of Copyrights issued to plaintiff a certificate of registration of a claim to copyright of the book "Ezra Pound," dated November 1, 1960, on Form A, Class A, registration No. 477602 (5; Pl.Ex. 2).

4. Defendant CBS is the corporate producer and owner of a television program entitled, "In Search of Ezra Pound," which was transmitted in three parts over the facilities of the CBS Television Network and simultaneously and otherwise broadcast by certain television stations during February and March 1966 (SM 3).

5. Defendants' program was transmitted and broadcast on a sustaining basis; that is, without commercial sponsorship and without any payment to CBS by the local television stations which broadcast it (4–5, 152).

6. The script for defendants' program was written by defendant Chodorov in the course of his duties as an employee of CBS (5).

7. Part I of the television program was first telecast on February 20, 1966. Part I was telecast again and Part II was telecast for the first time on February 27, 1966. Part III was telecast on March 6, 1966 (3). There is no claim of infringement as to Part III.

8. Plaintiff's book is intended to be historically and factually accurate and contains nothing which is knowingly fictional or inaccurate (101, 102).

9. The format or continuity of plaintiff's biography of Ezra Pound is chronological, with the exception that the story of Pound's life to his 16th year is related by plaintiff at the point where the poet himself wrote a memoir covering that first period (105–108).

10. Defendant Chodorov worked on the script for defendants' Ezra Pound program continuously from September 1965 to February 1966 with little time devoted to anything else. He did not see plaintiff's book until early January 1966 and he never read it in its entirety (525, 656–659, 518–520, 516–517).

11. As early as about 1954, while in college at Haverford, Chodorov began an interest in Ezra Pound and his works and

between that time and the production of the telecast, "In Search of Ezra Pound," he acquired an extensive number of books by and about Pound which he utilized in the creation of the script (500–506, 524–543; Deft.Exs. AA–QQ).

12. In the course of his work on defendants' program, Chodorov acquired and consulted many books in addition to those which he already owned, he assembled a large collection of clippings and shorter pieces of pertinent periodical literature from which he also drew material; he did considerable work collecting materials at the New York Public Library on Fifth Avenue; and he consulted various individuals with special knowledge of Pound who provided advice, information and materials, including a previously unpublished memoir of Pound by the poetess H.D. (544–563; Deft. Exs. VV–CCC, EEE–GGG, III–MMM; 577–590; Deft.Ex. WWW; 569–575; Deft.Exs. RRR, SSS, TTT, UUU; 563–569; Deft.Ex. G; Deft.Exs. NNN–QQQ; 597; Deft.Ex. YYY; 576–577). The foregoing constituted basic and independent research.

13. Plaintiff's claim of copyright infringement of his book, "Ezra Pound," by defendants' three-part television program, "In Search of Ezra Pound," is set forth in a parallel chart containing 148 separate items of alleged copying. References in these Findings to numbered "items" or to the "chart" are to the corrected chart, Plaintiff's Exhibit 3A (62, 64, 90, 224; Pl.Ex. 3A).

14. Item 10 of Exhibit 3A was as follows:

| #10. Page 8 (Top) [2] | #10a. Facing Page 14 |
|---|---|
| Photograph of HOUSE IN HAILEY. | Upper photograph same shown in televised program. |

I find that plaintiff obtained the photograph of the Hailey, Idaho home of Pound from a public official of Blain County, Idaho and had no exclusive rights to the use of the photograph (115–121; Deft. Ex. D) and that defendants had available for use another photograph of the same house (596–597).

15. Item 19 of Exhibit 3A was as follows:

| #19. Page 9, Lines 2–4 | #19a. Facing Page 14 |
|---|---|
| Photograph of HOUSE IN WYNCOTE. | Lower photograph—same as shown in televised program. |

I find that although defendants used the photograph of Ezra Pound's childhood home in Wyncote, Pennsylvania from plaintiff's book (317; Pl. Ex. 1), plaintiff had obtained no exclusive right to the use of that photograph (136–138).

16. Item 25 of Exhibit 3A was as follows:

| #25. Page 10, Lines 19–21 | #25a. Page 4, Line 20; page 5, Lines 31–32; Page 6, Lines 3–4 |
|---|---|
| NARRATOR: | |
| "*Another who knew Pound then, the poetess H. D.;* for a time they were more or less engaged. | "I have been looking at a photograph of H. D. (Hilda Doolittle) * * * One day, Pound gave Miss Doolittle a ring to wear to mark *their engagement, an unannounced event which pleased his family but not hers* [Pg. 5, Lines 31–32] * * * *When he went abroad permanently, any semblance of an engagement was over,* according to H. D. [Pg. 6, Lines 3–4]." |

I find that defendants' material includes only historical fact (140–143; Pl. Ex. 9; Deft. Ex. XX, p. 36) and that defendants' material

2. The script of defendants' telecast, "In Search of Ezra Pound," was never placed in evidence. These page references appear in Plaintiff's Exhibit 3A and refer to pages in the script.

was independently prepared by them from independent sources (140, 599–602; Pl. Ex. 9, p. 14A; Deft. Ex. XX, p. 36; 144–148).

17. Items 28 and 30 of Exhibit 3A were as follows:

#28.  Page 13, Lines 14–18

ROOMMATE (at Hamilton):
"He'd wake me up in the middle of the night."

#28a.  Page 13, Lines 18–19

"Claudius Alonza Hand, afterwards general counsel for the Corporation Trust Company of New York, who roomed with Pound, recalled that Pound used to wake him in the middle of the night to read poems to him."

#30.  Page 14, Lines 1–6

ROOMMATE: (continued)
"He's just look at me and without a word he'd tear up the manuscript into long strips and throw it into the wastebasket."

POUND READER:
(Tears the paper up, takes back beer)

#30a.  Page 13, Lines 20–21

"Then, said Mr. Hand, he would tear up the manuscripts and throw them into the wastebasket."

I find that defendants' allegedly infringing material under Items 28 and 30 concerning Ezra Pound at Hamilton College consists entirely of historical facts (155–158). Defendants have copied neither fact nor mode of expression from plaintiff. Moreover, defendants' material was based upon an article in the New York magazine of August 14, 1949 (604–606; Pl. Ex. 8).

18. Item 33 of Exhibit 3A was as follows:

#33.  Page 15, Lines 13–17

NARRATOR:
" 'Ef he'da wanted tew', That's how Pound wrote it in an essay from 'The Spirit of Romance.'  Pound, a master of reproducing speech to characterize the speaker."

#33a.  Page 16, Lines 31–33

"Pound's ability to reproduce speech which characterizes the speaker, as in the example just quoted, is probably unsurpassed by any American writer * * *."

I find that the statement by defendants was merely a comment or view expressed by them from Pound's own work; that the expression in plaintiff's work was not unique and is widely held and was not copied from plaintiff's book (171, 607–609; Deft. Ex. FFF, p. 104; Deft. Ex. KKK, p. 27).

19. Item 52 of Exhibit 3A was as follows:

#52.  Page 23

Photograph of DOROTHY SHAKESPEAR

#52a.  Facing Page 47

Top photograph of Dorothy (Shakespear) Pound same as shown in televised program. (See List of Illustrations page xvi. acknowledging loan of original photograph from Omar Shakespear Pound)

I find that defendants used the photograph of Dorothy Pound, formerly Dorothy Shakespear, from plaintiff's book in their program (318; Pl. Ex. 1). However, plaintiff obtained this photograph of Dorothy Pound, used in his book, from Dorothy Pound's son, Omar Pound, and the same photograph appears in a biography of Ezra Pound published subsequent to plaintiff's book. Plaintiff did not obtain exclusive rights to the use or control of the use of the photograph (204–208).

20.   Item 64 of Exhibit 3A was as follows:

#64.   Page 29, Lines 12–17

MRS. LANGLEY:

"Oh it was a quiet room, cheap if I might say so, didn't like it very much, if I might say so, except for the church bells, which he didn't much favor. And not dear, if I may say so.

"NARRATOR: He would live there several years.

"MRS. LANGLEY:

Clavichord in one corner, washstand in the other. And papers, papers, papers everywhere. Manuscripts * * *."

#64a.   Page 35, Lines 14–16 and Page 35, Lines 2–5

"Only one thing marred his happiness. The bells of St. Mary Abbot's strode through his room * * *

His flat—a single room—was on the top floor, rent eight shillings a week. There were two windows, under one an iron washstand, under the other a long oak table, littered with manuscripts and letters * * *."

I find that the alleged infringing material in respect to Pound's lodgings in London is set forth by plaintiff as an historical fact (238–239). There is no similarity of language (241). Moreover, defendants obtained the information from sources published both before and after plaintiff's book (610–614; Deft. Ex. XX, pp. 69–70; Deft. Exs. ZZZ, WWW).

21.   Item 65 of Exhibit 3A was as follows:

#65.   Page 30, Lines 1–2; 5–6

MRS. LANGLEY: (cont'd)

"And Americans, too; his school-chum Mr. Williams * * * and once a young Mr. Frost came and I sent him up * * *."

#65a.   Page 55, Lines 4–7

"From Germany, where he had taken a postgraduate course, came Dr. William Carlos Williams, April, 1910."

#65a.   Page 121, Lines 6–7

"another man arrived. * * * This was Frost."

I find that the statement in plaintiff's book is historical material in respect to Pound's visitors in London; that no similarity of language exists (242–244); moreover, that defendants obtained the material independently from a published source in plaintiff's book (630–633; Deft. Ex. XX, pp. 70, 86).

22.   Item 78 of Exhibit 3A was as follows:

#78.   Page 6, Lines 13–18

(PHOTO: POUND, 1913)

NARRATOR:

"He lived in the Kensington area in a room so small that, as William Carlos Williams said, you could touch every wall while standing in the center."

#78a.   Page 55, Lines 10–14

"From Germany, where he had taken a postgraduate course, came Dr. William Carlos Williams—April, 1910. He found his friend in the Church Walk flat and in 'his most romantic period 'as he was to term it. The room struck him as very small. 'You could touch all the walls standing in the middle of it', he told me."

I find that plaintiff's text with respect to the size of Pound's room in London is expressed as an historical fact and in the words of William Carlos Williams uttered in a conversation with plaintiff (262–263) and that the smallness of Pound's room was well known and has been published elsewhere than in plaintiff's book based upon sources other than plaintiff (266–269, 634–636; Deft. Ex. XX, p. 56).

23. Items 126, 127 and 128 of Exhibit 3A were as follows:

#126.  Page 29, Lines 10–13

MAN II.

(READING A CONTRACT)

"Mr. Pound agrees to translate such books as Mr. Liveright chooses, to the best of his ability and with reasonable promptitude."

#126a.  Page 253, Lines 4–12

"(Pound) drew up a 'memorandum of agreement' with H. B. Liveright for further translations * * *. 'Mr. Pound undertakes to translate such books as Mr. Liveright chooses to the best of his ability and with reasonable promptitude * * * ' "

#127.  Page 29, Lines 15–21

NARRATOR:

"Pound was translating from the French; and thought he might be able to support himself at it. However, there was one important, and typically Poundian proviso in the contract."

#127a.  Page 253, Lines 2–5

"He translated Cocteau's long poem 'The Cape of Good Hope' * * *. He translated The Natural Philosophy of Love by Remy de Gourmont * * * "

#128.  Page 30, Lines 2–4

MAN II.

"Mr. Liveright agrees not to demand Mr. Pound's signature on the translation of any work that Mr. Pound considers a disgrace to humanity or too imbecile to be borne."

#128a.  Page 253, Lines 20–23

" 'Mr. Liveright agrees not to demand Mr. Pound's signature on the translation of any work that Mr. Pound considers a disgrace to humanity or too imbecile to be borne.' "

I find that in Items 126 and 128 of the chart defendants copied the language of a published contract between Pound, and Horace Liveright from plaintiff's book wherein it is quoted. In Item 127 defendants used their own words to express a fact which is obvious from the text of the contract. At the time defendants created their program, the text of the Pound-Liveright contract was published only in plaintiff's book. The contract was, however, excerpted at page 58 of Doland Gallup's "Bibliography of Ezra Pound," where the reader is referred to plaintiff's book for the full text. Gallup's bibliography attempts to locate every available writing of Ezra Pound telling the reader where it can be found (332–338; Pl. Ex. 1, p. 253; 417–423; 411; Deft. Ex. LLL, p. 58; 415–417, 561).

Substantially all of defendants' material in Items 126, 127 and 128 is set forth in Gallup's "Bibliography of Ezra Pound." Half of the text of the contract used by defendants in Items 126 and 128 is quoted in Gallup and the rest of defendants' quote from the contract is reflected in a paraphrase of the contract by Gallup. The only part of defendants' material in Item 127 at issue is their statement that "Pound was translating from the French" and this fact is also given by Gallup (Deft. Ex. LLL, p. 58; 636–639).

In this connection I find that plaintiff had no rights in respect to the text of the contract except the right to publish its text in his own book and that he had no right to restrict its use or publication by others (411–415).

24. Item 135 of Exhibit 3A was as follows:

#135.  Page 31, Lines 24–25

POUND READER:

"Omar * * * Shakespear * * * Pound! Think of that crescendo."

#135a.  Page 284, Lines 3–6

"Olivia Shakespear told Cournos that Pound had remarked, when reeling off her grandson's name: 'Just note the crescendo.' "

I find that the material alleged to be infringed here is an historical fact and the words of Pound in respect to his son's name were as related by Pound's mother-in-law to one John Cournos, who knew Pound in London, and that defendants prepared this material from information supplied by a source independently of plaintiff (641–643).

25. Plaintiff's claim that defendants have infringed upon his work by reason of using identical sequences is without merit since the continuity of plaintiff's biography of Pound is chronological with the single exception that plaintiff's story of Pound's life to his sixteenth year is related by plaintiff at the point where the poet, Pound, himself wrote a memoir covering the earlier period (105–108).

## DISCUSSION

Plaintiff, Charles Norman, wrote and published a biography of Ezra Pound, a public figure, a poet's poet, now approximately 86 years of age, who, during portions of World War II, broadcast anti-American propoganda from an Italian radio station, for which he was later prosecuted. He raised a defense of mental incapacity to stand trial in the United States, remained in St. Elizabeth Hospital, Washington, D. C. for many years, then released and never tried. Much of his life was spent in England, France and Italy, where he now lives.

In February and March 1966, defendant Chodorov prepared and CBS telecast a three-part television program entitled, "In Search of Ezra Pound." The program was never repeated. Plaintiff sued for alleged copyright infringement of his book by said telecast. In support thereof he set forth 148 specific items of alleged infringement in addition to a general claim that substantial sequences of his material had been "lifted" by defendants. I have found no merit in any of the claims enumerated in the 148 parallelisms nor in the contention of infringement of sequences in plaintiff's book.

█ █ It is elementary, as stated by Judge Hough in Frankel v. Irwin, 34 F. 2d 142, 143 (S.D.N.Y.1918), that "Infringement of copyright is a tort, the burden of proving which is on the plaintiff, and it can be committed in only one way: By copying some substantial part of that which is lawfully copyrighted." This plaintiff has failed to do. See also Greenbie v. Noble, 151 F.Supp. 45, 68 (S.D.N.Y.1957).

In general, the basic principles of law applicable to this case are contained in Greenbie v. Noble, 151 F.Supp. 45 (S.D.N.Y.1957) and in Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2nd Cir. 1966), cert. denied 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) Both cases involved biographies: Greenbie of Anna Caroll, a prominent figure of the Civil War; Rosemont of Howard Hughes.

█ In Rosemont Enterprises, Inc. v. Random House, Inc., supra, in the opinion by Circuit Judge Moore, among other things, he stated as follows:

"* * * any writing purporting to deal with the life of a public figure is bound to touch upon the same events as have given rise to the publicity. * * *

* * * * * *

"'Fair use' is a 'privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner * * *' Ball, Copyright and Literary Property 260 (1944). See generally Latman, Fair Use of Copyrighted Works, Study No. 14, prepared for the Subcommittee on Patents, Trademarks and Copyrights, Senate Comm. on the Judiciary, 86th Cong., 2d Sess. (Comm. Print 1960). The fundamental justification for the privilege lies in the constitutional purpose in granting copyright protection in the first instance, to wit, 'To Promote the Progress of Science and the Useful Arts.' U.S.Const. art. 1, § 8. See Mathews Conveyor Co. v. Palmer-

Bee Co., 135 F.2d 73 (6th Cir. 1943); Note, 56 Colum.L.Rev. 585, 595 (1956). To serve that purpose, 'courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry.' Berlin v. E. C. Publications Inc., 329 F.2d 541, 544 (2d Cir. 1964). * * *

"Biographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works. Cf. Harris v. Miller, 50 U.S.P.Q. 306, 309 (S.D. N.Y.1941). This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution, e. g., so 'that the world may not be deprived of improvements, or the progress of the arts be retarded.' Sayre v. Moore, 1 East, 361, 102 Eng.Rep. 138, 139 (K.B. 1801); see West Publishing Co. v. Edward Thompson Co., 169 F. 833, 837 (E.D. N.Y.1909).[4] * * *

"4. As one noted authority has stated, 'The world goes ahead because each of us builds on the work of our predecessors. "A dwarf standing on the shoulders of a giant can see farther than the giant himself." Progress would be stifled if an author had a complete monopoly on everything in his book * * *' Chafee, Reflections on the Law of Copyright, 45 Colum.L.Rev. 503, 511 (1945). See, for example, the extensive sources listed by Albert J. Beveridge in The Life of John Marshall (4 vols.) (1919) and Eugene C. Gerhart in America's Advocate: Robert H. Jackson (1958)." (pp. 306–307)

In criticizing a decision in the Seventh Circuit entitled Toksvig v. Bruce Publishing Company, 181 F.2d 664 (7th Cir. 1950), Judge Moore wrote:

" * * * We, however, cannot subscribe to the view that an author is absolutely precluded from saving time and effort by referring to and relying upon prior published material. Cf. Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688 (2d Cir. 1938). It is just such wasted effort that the proscription against the copyright of ideas and facts, and to a lesser extent the privilege of fair use, are designed to prevent. See Gorman, Copyright Protection for the Collection and Representation of Facts, 76 Harv.L. Rev. 1569, 1584 (1963) (criticizing Toksvig v. Bruce Publishing Co., supra)." (p. 310)

■■ It may be that at times one or more descriptive words used in plaintiff's book were utilized to describe the same thing in defendants' telecast but in no material respect are the same words gathered together to show that the copyrighted work was copied. As stated in Greenbie v. Noble, supra:

" * * * It is clear that mere similarity of phraseology does not amount to an infringement since a copyright does not protect words and phrases as such. Lowenfels v. Nathan, D.C.S.D.N.Y., 1932, 2 F.Supp. 73; Lewys v. O'Neill, D.C.S.D.N.Y., 1931, 49 F.2d 603; Bachman v. Belasco, 2 Cir., 1915, 224 F. 817. Moreover, similarities of incidents alone will not constitute an infringement (Lowenfels v. Nathan, supra; Rush v. Oursler, D.C.S.D.N.Y., 1930, 39 F.2d 468), especially when both works are based on common sources and concern events in the life of an historic figure. De Acosta v. Brown, 2 Cir., 1944, 146 F. 2d 408, certiorari denied Hearst Magazines v. DeAcosta, 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983. * *" (p. 69)

See also Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688, 691 (2nd Cir. 1938).

As already enunciated, the sequence followed by plaintiff was almost wholly chronological (Finding of Fact 9). Judge Learned Hand once wrote:

" * * * not only are all the facts recorded in a history in the public domain, but, since the narration of

history must proceed chronologically, —or at least, such is the convention, —the order in which the facts are reported must be the same in the case of a second supposed author. There cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection, although into that selection may go the highest genius of authorship, for indeed, history depends wholly upon a selection from the undifferentiated mass of recorded facts." Myers v. Mail & Express Company, 36 C.O.Bull. 478, 479 (S.D.N.Y.1919) (unreported).

See also Collins v. Metro-Goldwyn Pictures Corporation, 106 F.2d 83, 86 (2nd Cir. 1939).

By reason of the facts which I have hereinabove found and because of the law applicable to such facts, I am forced to conclude that plaintiff's claims in this case have no merit. I must, therefore, dismiss the complaint.

As suggested by another decision, plaintiff has based his complaint upon "erroneous understanding of the extent of copyright protection" and partly upon the conviction "so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." Dellar v. Samuel Goldwyn, Inc., 150 F. 2d 612 (2nd Cir. 1945) (per curiam opinion by Circuit Judges Learned Hand, Augustus N. Hand and Charles E. Clark).

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter and of the parties in this action.

2. By consent of plaintiff's counsel, this action was dismissed on its merits against defendant Dan Gallagher.

■ 3. The items of plaintiff's alleged claims of infringement (see Pl. Ex. 3A) which were dismissed at the close of plaintiff's case consist of material constituting historical facts, material which is in the public domain, isolated words or phrases, ideas or creations of plaintiff's mind or which are not original with plaintiff and, hence, are not copyrightable. See Greenbie v. Noble, 151 F.Supp. 45, 65–66, 69 (S.D. N.Y.1957).

■ 4. Plaintiff never obtained exclusive rights in the photographs which were the subject of Items 10, 19 and 52 on Exhibit 3A and said photographs are not copyrightable by him. Egner v. E. C. Schirmer Music Co., 139 F.2d 398 (1st Cir.), cert. denied 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565 (1943); Public Ledger v. New York Times, 275 F. 562 (S.D.N.Y.1921), cert. denied 258 U.S. 627, 42 S.Ct. 383, 66 L.Ed. 798 (1922); Van Cleef & Arpels v. Schecter, 308 F.Supp. 674 (S.D.N.Y.1969); Cf., Copyright Act, 17 U.S.C.A. § 8; Cf., Banks v. Manchester, 128 U.S. 244, 251– 254, 9 S.Ct. 36, 32 L.Ed. 425 (1888).

■■ 5. The historical and factual contents of plaintiff's material in Items 25, 28, 30, 64, 65 and 135 are not copyrightable by him. Greenbie v. Noble, 151 F.Supp. 45 (S.D.N.Y.1957); Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2nd Cir. 1966), cert. denied 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); the material mentioned in the just above-mentioned items does not infringe plaintiff's material because this material was not copied from plaintiff but was independently created by defendants. Arnstein v. Edward P. Marks Music Corp., 82 F.2d 275 (2nd Cir. 1936); Nimmer on Copyright, §§ 100, 141, 143.

■ 6. Plaintiff's conception, viewpoint or idea embodied in his material in Item 33 is not within the scope of protection afforded by copyright. Dellar v. Samuel Goldwyn, 150 F.2d 612 (2nd Cir. 1945); Greenbie v. Noble, supra.

7. Neither the historical and factual content of plaintiff's material in Item 78 nor the phrase used therein to describe the size of Pound's room in London is copyrightable. Greenbie v. Noble, supra. Insofar as the phrase used by plaintiff in Item 78 to describe the size of Pound's room is quoted from William Carlos Williams in private conversation plaintiff acquired no rights to prevent its repetition by others. Cf. Estate of Hemingway v. Random House, 23 N.Y.2d 341, 345–350, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968).

8. Plaintiff has no copyrightable interest in the material from the Pound-Liveright publishing contract set forth in Items 126, 127 and 128. Egner v. E. C. Schirmer Music Co., supra; Public Ledger v. New York Times, supra; Greenbie v. Noble, supra; Van Cleef & Arpels v. Schecter, supra.

9. If any of plaintiff's material in the items disposed of in Conclusions of Law numbered 4 through 8 was copyrightable and actually copied by defendants, such use by defendants would be a fair use. Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2nd Cir. 1966), cert. denied 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); Greenbie v. Noble, supra.

10. All plaintiff's claims of copyright infringement of his book entitled, "Ezra Pound," are dismissed.

11. Defendants are entitled to judgment herein dismissing the complaint with costs.

12. Upon application by defendants, upon papers, including affidavits of services, and after submission of any opposing papers by plaintiff, and a hearing thereon, the court will determine whether or not defendants are entitled to allowance for attorneys' fees, and, if so, how much. In the meantime let entry of judgment be deferred.