**SANGA MUSIC, INC., Plaintiff–Appellant,**

v.

**EMI BLACKWOOD MUSIC, INC., EMI Songs Limited, Reprise Records and Warner Music International, a Division of Warner Communications, Inc., Defendants–Appellees.**

**No. 1049, Docket 94–7867.**

United States Court of Appeals, Second Circuit.

Argued March 9, 1995.

Decided May 31, 1995.

Robert C. Osterberg, New York City (Eric Osterberg and Abeles Clark Osterberg and Prager, on the brief), for plaintiff-appellant.

Charles B. Ortner, New York City (Charles B. Ortner, Peter S. Canelias, and Paul, Hastings, Janofsky & Walker, on the brief), for defendants-appellees.

Before: MAHONEY, WALKER, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiff, Sanga Music, Inc. ("Sanga"), as purported copyright proprietor, appeals from the judgment entered in the United States District Court for the Southern District of New York, Charles S. Haight, Jr., *Judge,* granting summary judgment to defendants EMI Blackwood Music, Inc., EMI Songs Limited, Reprise Records, and Warner Music International in an action alleging copyright infringement.[1] Sanga claimed infringement

1. Defendant EMI Songs Limited denied personal jurisdiction and did not join in the motion for summary judgment or in the present appeal.

of its copyright in the third verse of a folk song.

## Background

During her childhood, Doris Plenn, plaintiff's assignor, a woman now in her 80's, learned from her grandmother a traditional folk hymn, "How Can I keep From Singing" (the "Song"). The Song had two eight-line verses. Sometime in the 1950's, Plenn wrote a third verse. In 1956, Plenn visited the family of her friend Pete Seeger, the noted folk singer. During the visit, Plenn taught the Song to Seeger in the hope that Seeger would keep it alive. Seeger wrote down the music and the lyrics (including the third verse) as Plenn told them to him.

Shortly thereafter, in 1957, Seeger arranged for publication of the Song, including Plenn's stanza, in *Sing Out!*, a magazine which published folk and traditional music. The only copyright notice was that on the magazine's masthead which asserted, "Volume 7, Number 1 Spring, Copyright 1957 by SING OUT, Inc., 80 E. 11th St., New York, N.Y. All rights reserved." An introductory text accompanying the Song told that Seeger had learned it from Plenn who had learned it from her grandmother, and suggested that it was probably over 100 years old.

Seven years later, in 1964, Seeger again caused the publication of the Song, with Plenn's stanza, in *The Bells of Rhymney and Other Songs and Stories from the Singing of Pete Seeger*. On the back of the title page of the book, there appeared a copyright notice, making no specific reference to the Song, in the name of the publisher of the songbook. The text accompanying the Song noted that Plenn had been taught the Song by her Quaker grandmother, and added "Author unknown."

In 1965, Plenn assigned to Sanga all her rights, title, and interest in her lyrics for the third stanza. Subsequent to 1965, additional publications of the Song occurred in reprints of *The Bells of Rhymney* and *Sing Out!*, accompanied by copyright notices naming Sanga as proprietor.

In 1992, Sanga brought this action charging the defendants with copyright infringement by reason of their involvement in the distribution of *Shepherd Moons*, a sound recording album by the performer Enya, which includes Enya's performance of the Song, including the third verse. Defendants moved for summary judgment arguing, among other grounds, that the Plenn lyrics were put into the public domain by Seeger's publications, authorized by Plenn.

The district court awarded summary judgment to defendants. The court held that:

> Plenn conveyed the Song to Seeger in a manner which implicitly, if not explicitly, authorized Seeger to publish it; that Seeger published the Song in a manner consistent with that authority, first in 1956 ... and again in [1964] ...; and that the first of these publications injected the Song into the public domain, so that anyone, including the defendants, may copy it.

We affirm.

## Discussion

■ Summary judgment is appropriate where there is no genuine issue as to any material fact. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). We review a grant of summary judgment *de novo*. *Vezzetti v. Pellegrini*, 22 F.3d 483, 485 (2d Cir.1994).

■ Because the Song was published before 1978, the Copyright Act of 1909 (the "1909 Act") and principles of common law copyright provide the governing law.[2] Common-law copyright protects the author's interest prior to publication and allows the author to control the first publication of the work. 17 U.S.C. § 2 (1909 Act). Common-law copyright is extinguished upon the publication of the work by the author, or upon the publication by another with the author's consent. *See Estate of Hemingway v. Random House, Inc.*, 23 N.Y.2d 341, 244 N.E.2d 250, 254 & n. 1, 255–56, 296 N.Y.S.2d 771, 776 &

---

**2.** The Copyright Act of 1909, as amended, was superseded by the Copyright Act of 1976 (effective Jan. 1, 1978).

n. 1, 778–79 (1968). Once the work is published, the author must rely for protection on federal statutory copyright. *Id.* at n. 1. In order to determine whether, as the district court found, the publication of the Song in *Sing Out!* extinguished Plenn's common-law copyright, we must first examine whether Plenn authorized Seeger's publication of the Song when she taught it to him in 1956.

■ Because the meeting between Seeger and Plenn took place almost forty years ago, neither Plenn nor Seeger has a precise memory of what words were spoken. However, the testimony of both makes clear that when Plenn taught Seeger the Song, she communicated her authorization to publish it, without placing any restrictions on that authorization. Plenn taught Seeger the Song in the hope of keeping it alive; her hope was that Seeger would sing it, record it, publish it—whatever would keep it from becoming forgotten. She testified as follows:

Q   And were you aware that Pete Seeger was going to be publishing this song in *Sing Out* as part of—

A   I hope so. Well, I didn't know he was going to be publishing it in *Sing Out,* I hoped he was going to be doing something with it; sing it and record it. That's why you give a song to a folk singer, is it not?

Q   Yes. And that was okay with you that he would publish it?

A   You want them to be alive.

Q   And that was okay with you that. he would publish it; correct?

A   Uh-huh.

Q   Yes?

A   Sure. Indeed.

Q   You testified also before, you said Pete didn't have to ask me for permission to publish the song in *Sing Out.*

A   No, No.

Q   Is that right?

A   Indeed. Certainly he didn't. It was a gift freely given with the hope that it would be kept alive.

The testimony of Seeger and Plenn agreed that she had placed, no restrictions on Seeger's publication of the Song and had reserved no rights. Indeed Seeger had no recollection that she had even mentioned her authorship of the third verse. Plenn claimed she had. On the motion for summary judgment, we accept her version. Nonetheless, it is clear that her authorization to publish was unconditional and included no restriction requiring a copyright notice in her favor. We therefore conclude that the publication in *Sing Out!* was done with Plenn's authorization and constituted publication by the author as if she had directly arranged for it herself. This publication nullified Plenn's common-law copyright.

■ The second question concerns the effect on Plenn's statutory copyright caused by Seeger's authorized publication in *Sing Out!* Under Section 10 of the 1909 Act, it was blackletter that the statutory copyright was achieved "by publication ... with the notice of copyright required by this title," 17 U.S.C. § 10 (1909 Act), and that publication without compliance placed the work in the public domain. *See Nat'l Comics Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 598 (2d Cir.1951); 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 4.01[B] (1994); 1 William F. Patry, *Copyright Law and Practice* 421–26 (1994).

■ Defendants argue, and the district court concluded, that because the initial *Sing Out!* publication did not have a copyright notice referring specifically to the Song, that publication was without copyright notice. This misreads the Act, which did not require a separate notice referring to each entry in a collective work or magazine. Section 3 provided, "The copyright upon composite works or periodicals shall give to the proprietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this title." 17 U.S.C. § 3 (1909 Act). Section 20 provided that "the notice of copyright shall be applied, in the case of a book or other printed publication, upon its title page or the page immediately following, ... or if a musical work either upon its title page or the first page of music...." 17 U.S.C. § 20 (1909 Act). It went on to provide that "[o]ne notice of copyright in each volume or in each number of a newspaper or periodical published shall suffice." *Id.* A single copyright notice· in the name of

the copyright owner of a collective work sufficed to protect each collected item. 2 Nimmer § 7.12[C][1] at 7–94 to –95. There was, accordingly, no deficiency of notice resulting from the fact that only the single masthead notice appeared.

■ In another respect, however, *Sing Out!*'s masthead notice failed to comply with the requirements of the Act. Section 19 required that "[t]he notice of copyright . . . shall [be] . . . accompanied by the name of the copyright proprietor. . . ." 17 U.S.C. § 19 (1909 Act). The copyright notice in *Sing Out!* asserted that the copyright was held by Sing Out, Inc., the publisher of the magazine. Sing Out, Inc. was not the copyright proprietor; it possessed no interest in the copyright other than the license communicated by Seeger to publish the Song.

Courts construing the 1909 Act, furthermore, troubled that an infringer might be subjected to an unreasonable succession of suits if the holders of different segments of the copyright were each empowered to sue for infringement, devised a rule of indivisibility, *see* 1 Patry at 386, and refused to recognize subdivided interests in a copyright. *See Goodis v. United Artists Television, Inc.*, 425 F.2d 397, 400 (2d Cir.1970); 3 Nimmer § 10.01[A]. Going further, courts ruled that, if the copyright notice failed to name the proprietor as required by § 19, and instead named the holder of an unrecognized subdivided interest such as a licensee, the discrepancy would constitute failure to comply with the statutory prerequisites to establish the copyright and would place the work in the public domain. *See e.g., Mail & Express Co. v. Life Pub. Co.*, 192 F. 899 (2d Cir.1912); *Geisel v. Poynter Prods., Inc.*, 295 F.Supp. 331 (S.D.N.Y.1968). *See also* 2 Nimmer § 7.12[C][1] at 7–94 to –95, 3 Nimmer § 10.01[C][2] at 10–13 to –14. This rule caused harsh forfeiture with little or no justification.

In *Goodis v. United Artists Television, Inc.*, 425 F.2d 397 (2d Cir.1970), this court refused to follow the rule. Goodis had written a book entitled *Dark Passage* and had arranged for first publication as a serial in the *Saturday Evening Post,* to be followed by hardcover publication. He also sold movie rights. During the initial serial publication, each issue of the magazine contained a single copyright notice in the name of the magazine. Later, an assertedly unlicensed producer created a television series based on the book. The author brought suit, and the defendant argued successfully in the district court that *Dark Passage* had fallen into the public domain when the *Saturday Evening Post* published it under a copyright notice that named itself instead of the true proprietor. This court rejected the application of the indivisibility rule and held that "where a magazine has purchased the right of first publication under circumstances which show that the author has no intention to donate his work to the public, copyright notice in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor." *Id.* at 399.

Two circumstances particularly supported the wisdom of that ruling. First, nothing about the circumstances of the licensing of first publication in the *Saturday Evening Post* suggested an intention on the author's part to place his work in the public domain. Indeed his intention was obviously to establish and preserve his copyright, as he had contracted to follow the initial serial publication with a book and a movie. Second, nothing about the manner of publication misled the public to rely on an expectation that the work was in the public domain.

*Goodis* has since been followed repeatedly. Courts have used its authority to avoid harsh forfeitures in circumstances where the author had manifested no intent to contribute his work to the public and the public had not been misled into a reasonable belief that the work had been placed in the public domain. *See e.g., Abend v. MCA, Inc.*, 863 F.2d 1465, 1468–70 (9th Cir.1988), *aff'd sub nom. Stewart v. Abend,* 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (affirming without addressing this issue); *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 486–87 (5th Cir.1981); *Varon v. Santa Fe Reporter, Inc. et al.* 218 U.S.P.Q. 716, 717, 1982 WL 1289 (D.N.M.1982). Here, however, the facts are different as to both of these significant circumstances.

When Plenn authorized Seeger to publish the Song, her words and actions exhibited an intention to place the work in the public domain. The intention she manifested was to insure that the Song, which had meant so much to her and to her grandmother, not be forgotten. She expressed no desire to receive either credit or royalties or to establish or preserve any ownership interest in the third verse. She placed no restrictions of any kind on the manner of publication. It was merely fortuitous that the publication was accompanied by any kind of copyright notice, as a consequence of the practice of *Sing Out!* to publish a notice on the masthead of each issue—not due to any request by Plenn.

Sanga argues that Plenn had no intention to relinquish her ownership of the copyright in the third verse and that, on a motion for summary judgment, the court may not make a contrary finding. It is, however, not a contrary finding. Sanga confuses the issues. To find the scope of Plenn's authorization to Seeger, we are more concerned with what she communicated to Seeger, than with undisclosed subjective intentions. *See Restatement (Second) of Agency* § 26 (1958). Although on the motion for summary judgment we must credit Plenn's testimony that she told Seeger of her authorship of the third verse, she apparently did this in such a low-key manner that it made no impression on Seeger, despite his clear interest in the Song. Seeger was Plenn's friend. He would undoubtedly have taken pains to preserve her interest had she requested this. He nonetheless arranged for the Song's publication without taking any steps to protect her interest and has no recollection of having been told of her authorship of the third verse. From the testimony of both Plenn and Seeger, it emerges unmistakably that the intention manifested by Plenn was simply to get Seeger to spread the Song around and keep it alive—not to protect her commercial interest in the words to the third verse.

The facts here are also significantly different from *Goodis* as to the message communicated to the public. In *Goodis* nothing suggested to a reader that the published matter was not under copyright. Here, notwithstanding the copyright notice on the masthead of the magazine, the overall message informed the public that this was an old folk song, of unknown authorship, and in the public domain. The Song was introduced by editorial text, under the caption "Heritage U.S.A.," relating that Plenn had learned the Song from her grandmother who said that "it had been written during the early days of the Quaker church, 250 or more years ago." Although the text casts some doubt on certain aspects of the legend, by pointing out that the Quakers did not sing hymns in their church services, it does not cast doubt on the Song's antiquity. The text notes that another version of the same hymn was published in 1894 and concludes that this one is probably older. All this is coupled with the fact that *Sing Out!* was devoted to publishing folk music, rather than contemporary copyrighted material. The publication therefore communicated to the reader that this was old material in the public domain.

We therefore conclude that this is not an appropriate case for application of *Goodis*. In general, we shy away from the unnecessary harshness of the pre-*Goodis* rule that would forfeit a copyright interest merely because the wrong entity was named as copyright proprietor in the copyright notice. However, in these unusual circumstances, the rule is not harsh or unfair. Where the publication was authorized in a manner that manifested intent to put the work into the public domain, there is no unfairness in having the publication accomplish what the author authorized. Had Seeger arranged for publication of the Song without any copyright notice, we would have no hesitation in holding that he was authorized to do so by the terms of Plenn's request. Secondly, where the manner of publication so clearly suggests to the readers that the material is available for public use, the danger is rather of unfair deception of a reader who reasonably assumes the right to use the material, only to be sued for infringement.

We conclude that Seeger's publication, with Plenn's authorization, in a manner that did not comply with the statutory requirement, placed Plenn's third verse in the public

762

domain. We therefore affirm the judgment of the district court.