168 F.3d 586
 1999 Copr.L.Dec. P 27,857, 49 U.S.P.Q.2d 1599
 SHOPTALK, LTD., Alan Menken,
Plaintiffs-Counterclaim-Defendants-Appellants-
Cross-Appellees,
v.
CONCORDE-NEW HORIZONS CORP.,
Defendant-Counterclaimant-Appellee-Cross-Appellant.
 Nos. 97-9209, 97-9251.
 United States Court of Appeals,
Second Circuit.
 Argued May 22, 1998.
Decided Feb. 3, 1999.
 
 Dorothy M. Weber, New York, New York (Lisa Martinez, Shukat Arrow Hafer & Weber, New York, NY, on the brief), Plaintiffs-Counterclaim-Defendants-Appellants- Cross-Appellees.
 Howard R. Cohen, New York, New York, (Eric M. Kraus, Natalie A. Napierala, Sedgwick, Detert, Moran & Arnold, New York, NY, on the brief), Defendant-Counter Claimant-Appellee-Cross-Appellant.
 Daniel S. Alter, Assistant United States Attorney, New York, NY (Mary Jo White, United States Attorney for the Southern District of New York, Steven M. Haber, Assistant United States Attorney, New York, NY, on the brief), for United States Copyright Office as amicus curiae.
 James Niss, New York, NY, filed a brief as Amicus Curiae pro se.
 Before MESKILL and KEARSE, Circuit Judges, and TELESCA*, District Judge.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Shoptalk, Ltd. ("Shoptalk"), and Alan Menken appeal from so much of a final judgment of the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, as (a) ordered Shoptalk to pay defendant Concorde-New Horizons Corp. ("Concorde") $75,592.65 and ordered Menken to pay Concorde $56,843.84, both sums representing unpaid royalties and prejudgment interest, for use of material in a 1959 screenplay co-owned by Concorde and registered for copyright protection in 1982 as an unpublished work, and (b) ordered plaintiffs to make future royalty payments until the expiration of the copyright in the screenplay. The district court ruled that Concorde's copyright in the screenplay has not expired because the screenplay was neither published nor registered prior to 1982, notwithstanding the 1960 publication of a motion picture (whose copyright has now expired) based on the screenplay. On appeal, Shoptalk and Menken, supported by the United States Copyright Office ("Copyright Office") as amicus curiae, argue that the district court erred in ruling that publication of the motion picture did not constitute publication of its underlying screenplay. Concorde has cross-appealed from so much of the judgment as limits its recovery of royalties to the lives of the copyrights in the screenplay and the motion picture, contending that an agreement among the parties obligates plaintiffs to pay royalties independently of the existence of the copyrights. For the reasons that follow, we reject Concorde's arguments in support of its cross-appeal, and we agree with plaintiffs and the Copyright Office that, under the Copyright Act of 1909, which governs works published before 1978, see 17 U.S.C. § 1 et seq., ("1909 Act"), repealed effective 1978 by Copyright Act of 1976, 17 U.S.C. § 101 et seq. ("1976 Act"), the publication of the Motion Picture in 1960 published so much of the Screenplay as was disclosed in the Film. We therefore affirm in part, vacate in part, and remand for further proceedings.
 
 I. BACKGROUND
 
 2
 At the core of the present dispute is an original screenplay ("Screenplay") entitled "The Little Shop of Horrors," authored by Charles Byron Griffith in 1959, which is the subject of an agreement dated May 27, 1983 ("1983 Agreement" or "Agreement") settling a prior dispute. The facts have largely been stipulated here.
 
 
 3
 A. The Film, the Musical Stage Play, and the 1983 Agreement
 
 
 4
 In 1960, a motion picture entitled "The Little Shop of Horrors" ("Motion Picture" or "Film") was produced, based on the Screenplay. The Screenplay was registered for copyright protection in 1982, pursuant to an application indicating that it was an unpublished work. The copyright in the Screenplay was assigned jointly to Griffith and Millennium Films, Inc. ("Millennium"), which was successor-in-interest to New World Pictures, Inc. ("New World"), the original owner of the Motion Picture. The Motion Picture itself was registered for copyright protection in 1985, and its registration stated the Film's date of first publication as January 5, 1960. The copyright in the Motion Picture was assigned to Millennium. Concorde is a successor-in-interest to Millennium and has "all of Millennium's rights, if any," in the Film "and Millennium's rights, if any, in and to the underlying screenplay." (Joint Statement pursuant to Rule 3(g) of the Local Rules for the Southern District of New York (1994) p 10.)
 
 
 5
 In 1981, New World authorized the production of a musical stage play ("Musical") based on the Film. The Musical's score was composed by Menken; its book and lyrics were written by Howard Ashman, who eventually assigned his rights and obligations in the book and lyrics to Shoptalk. A controversy arose in 1982 when Griffith contended that the Musical infringed his rights in the Screenplay; the dispute was settled by the 1983 Agreement.
 
 
 6
 In the 1983 Agreement, the Musical's producers were given the rights, inter alia, to "make, write[,] compose," and produce a "dramatico-musical stage play" based on the Motion Picture and the Screenplay (1983 Agreement p SECOND); in return, Menken, Ashman, and the producers agreed to pay royalties (id. p THIRD). The 1983 Agreement provided that the copyright "Owner" (defined as Millennium and Griffith) would "renew or extend" the copyright in "the Work" (defined as the Motion Picture) prior to its expiration, and that if they
 
 
 7
 should fail or neglect to execute or record any document required to renew or extend such copyright, and/or to confirm or effectuate the rights granted hereunder, ... [Menken and Ashman] shall have the right to execute or record such document, in Owner's name as Owner's irrevocable attorney-in-fact.
 
 
 8
 (Id. p NINTH.)
 
 
 9
 The copyright in the Film was not renewed; it expired in 1988, and the Film entered the public domain. Sometime prior to 1991, Shoptalk and Menken learned of the failure to renew, and they thereafter ceased making royalty payments to Concorde. (They continued, however, to pay royalties to Griffith.)
 
 B. The Present Action
 
 10
 Plaintiffs commenced the present diversity action in 1993, asserting principally that their obligations to make royalty payments under the 1983 Agreement ended upon the expiration of Concorde's copyright in the Motion Picture. Plaintiffs contended that, in the Agreement, Concorde agreed to renew the copyright in the Motion Picture and that the failure to do so constituted a material breach, relieving them of any further royalty obligations. The amended complaint requested a judgment declaring, inter alia, that, pursuant to the Agreement and United States copyright law, Concorde had no right to collect further domestic royalties; that plaintiffs were entitled to reimbursement for royalty payments made to Concorde after the copyright's expiration; and that their continuing production of the Musical would not constitute copyright infringement of the Motion Picture.
 
 
 11
 Concorde took the position that plaintiffs' rights and obligations under the 1983 Agreement were not conditioned on the renewal of the Motion Picture copyright and that it was plaintiffs who had breached. Concorde alleged that plaintiffs had agreed to pay royalties based on "the right to prepare, produce, and publicly perform and/or display a musical play based upon and derived from the screenplay and the original motion picture" (Answer p 46), and that by failing to pay royalties on the performance or display of "derivative works based upon the screenplay and motion picture," plaintiffs had breached and were continuing to breach the 1983 Agreement (id. p 49). Concorde contended that its nonrenewal of the Motion Picture copyright gave plaintiffs the right to renew the copyright but gave them no other rights.
 
 
 12
 Concorde also contended, inter alia, that a valid copyright subsisted in the underlying Screenplay, which preserved Concorde's right to receive royalty payments under the Agreement, and that plaintiffs' claims were barred by estoppel, ratification, laches, and waiver. In a counterclaim, Concorde requested, inter alia, a judgment declaring that plaintiffs remained bound by the terms of the 1983 Agreement, an injunction prohibiting plaintiffs from exercising rights granted by the Agreement, and compensatory damages for unpaid royalties due under the 1983 Agreement.
 
 
 13
 Plaintiffs disputed Concorde's contention that the copyright in the Screenplay could survive expiration of the copyright in the Motion Picture, arguing that the publication of the Motion Picture also published the underlying Screenplay. Accordingly, plaintiffs argued that the Screenplay was published when the Film was produced in 1960, and that when the copyright in the Film was not renewed in 1988, both the Motion Picture and the Screenplay entered the public domain.
 
 
 14
 The parties submitted to the court a joint statement of the material facts as to which they agreed there was no genuine dispute, and both sides moved for summary judgment. In an opinion reported at 897 F.Supp. 144 (1995), the district court granted in part and denied in part both motions. Citing New York State law, it agreed with plaintiffs that, because "[a]bsent the Motion Picture copyright, [Concorde] would have had nothing of value to sell or convey to Plaintiffs,"
 
 
 15
 the expiration of the Motion Picture copyright operated to extinguish those of Plaintiffs's obligations under the 1983 Agreement which were dependent on the Motion Picture copyright.
 
 
 16
 Id. at 146 (citing April Productions, Inc. v. G. Schirmer Inc., 308 N.Y. 366, 374, 126 N.E.2d 283, 288 (1955)). Thus the court concluded that plaintiffs were entitled to a declaration that Concorde's "right, pursuant to the 1983 Agreement, to receive domestic royalties, based on the use of the Motion Picture, expired simultaneously with the expiration of the Motion Picture copyright," and it denied Concorde's request for "damages for unpaid royalties relating to the Motion Picture." 897 F.Supp. at 147.
 
 
 17
 However, the district court agreed with Concorde that a valid copyright in the Screenplay survived the expiration of the statutory copyright in the Film. It rejected plaintiffs' contention that publication of the Motion Picture also published the underlying Screenplay, stating that a motion picture is a distinct "derivative work" of the underlying screenplay that "[does] not vitiate common law copyrights in the ... original work." Id. at 146 (internal quotation marks omitted). The court also rejected plaintiffs' contention that the Motion Picture and Screenplay were so nearly identical as to constitute a single work for copyright purposes, stating that
 
 
 18
 a rule stating that works with minimal variation between them are the same work for copyright purposes would require extensive examination of the alleged comparable works by the finder of fact, which would both unnecessarily waste judicial resources as well as introduce substantial uncertainty as to a copyright's validity prior to a Court's adjudication of the issue.
 
 
 19
 Id. at 147. The court concluded that "the Screenplay enjoys continued protection, and all rights stemming from the Screenplay, including any rights retained by [Concorde] ... remain in effect," and that Concorde "retains the right to receive royalties for use of the Screenplay under the 1983 Agreement." Id.
 
 
 20
 Judgment was entered ordering plaintiffs to pay past-due royalties as indicated above and to continue paying royalties until the expiration of the copyright in the Screenplay, but not longer.
 
 C. The Present Appeals
 
 21
 In this Court, plaintiffs and Concorde principally pursue the positions they advocated in the district court. On its cross-appeal, Concorde contends chiefly that the 1983 Agreement is enforceable independently of the validity its copyright in the Motion Picture or the Screenplay, and that plaintiffs waived their rights to seek relief from their contractual obligations. We reject these contentions substantially for the reasons stated by the district court. See April Productions, Inc. v. G. Schirmer, Inc., 308 N.Y. at 375, 126 N.E.2d at 289 (under rules of construction applicable to copyright licenses, an "agreement may not ... in the absence of express language ... be construed to require payment of royalties after the expiration of the underlying copyrights."). We see no such express contractual language in this case, nor any waiver. Accordingly, we affirm so much of the district court's judgment as is challenged in the cross-appeal.
 
 
 22
 On plaintiffs' appeal, the Copyright Office--which did not appear in the district court--has submitted a brief as amicus curiae, arguing that, under the 1909 Act, "portions of screenplays embodied in the motion picture are published upon publication of the motion picture." (Brief of Copyright Office at 16 (internal quotation marks omitted).) Concorde urges that we reject this view on the basis that Griffith had a common-law copyright in the Screenplay and that constituted a "subsisting copyright" within the meaning of § 7 of the 1909 Act and hence, by the terms of that section, was not affected by the publication of the Film as a derivative work. For the reasons that follow, we reject Concorde's reading of the 1909 Act and agree with plaintiffs and the Copyright Office that the publication of the Motion Picture in 1960 published so much of the Screenplay as was disclosed in the Film.
 
 II. DISCUSSION
 
 23
 The Constitution gives Congress the power "[t]o promote the progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries...." U.S. Const. Art. I., § 8, cl. 8. The copyright statutes enacted by Congress have thus had as their purpose protecting the "benefit of [such] property for a limited term of years," and those "statutes should be given a fair and reasonable construction with a view to effecting such purpose." American Tobacco Co. v. Werckmeister, 207 U.S. 284, 291, 28 S.Ct. 72, 52 L.Ed. 208 (1907).
 
 
 24
 The 1909 Act, which was repealed by the 1976 Act, governs works published before 1978. See, e.g., 1976 Act, 17 U.S.C. § 301(b)(2); Sanga Music, Inc. v. EMI Blackwood Music, Inc., 55 F.3d 756, 758 (2d Cir.1995). The 1909 Act established a regime in which published works could receive statutory protection under federal law, while unpublished works retained such protection as they were given by state common law.
 
 
 25
 Under the 1909 Act, the publication of a work, with a proper notice, secured statutory copyright protection. See 17 U.S.C. § 10 (repealed effective 1978). " '[P]ublication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public....' " Bartok v. Boosey & Hawkes, Inc., 523 F.2d 941, 945 (2d Cir.1975) (quoting 1 M. Nimmer, The Law of Copyright § 49, at 194-95 (1974)). The 1909 Act provided authors an initial 28-year term of protection, calculated from the date of publication, which could be renewed for an additional 28 years. See 17 U.S.C. § 24 (repealed effective 1978). If the initial copyright term expired without renewal, the work entered the public domain; if the copyright was renewed, the work entered the public domain at the conclusion of the renewal term.
 
 
 26
 Under the 1909 Act, unpublished works retained common-law protection. Section 2 of that Act provided as follows:
 
 
 27
 Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, or to obtain damages therefor.
 
 
 28
 17 U.S.C. § 2 (repealed effective 1978). Thus, the 1909 Act "specifically exempt[ed] from coverage (and from preemption) the common-law right of an author of an 'unpublished' work." Roy Export Company Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc., 672 F.2d 1095, 1101 (2d Cir.) ("Roy Export "), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).
 
 
 29
 The common law "protects the author's interest prior to publication." Sanga Music, Inc. v. EMI Blackwood Music, Inc., 55 F.3d at 758. It thus "allows the author to control the first publication of the work." Id. Once the author publishes the work, or a third party publishes the work with the consent of the author, the author's common-law right of first publication ends. See, e.g., Caliga v. Inter Ocean Newspaper Co., 215 U.S. 182, 188, 30 S.Ct. 38, 54 L.Ed. 150 (1909) ("At common law, the exclusive right to copy existed in the author until he permitted a general publication. Thus, when a book was published in print, the owner's common-law right was lost."); Batjac Productions, Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1226, 1235 (9th Cir.1998); Sanga Music, Inc. v. EMI Blackwood Music, Inc., 55 F.3d at 758. Further, the securing of a statutory copyright, either by general publication with a proper notice or by registration of the work, ended the common-law protection. See, e.g., Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 347, 28 S.Ct. 722, 52 L.Ed. 1086 (1908) (common-law and statutory "rights do not co-exist in the same composition; when the statutory right begins the common-law right ends"); Roy Export, 672 F.2d at 1101 n. 13 ("a single work cannot be protected from copying under both federal and state law at the same time"); Jewelers' Mercantile Agency v. Jewelers' Weekly Publishing Co., 155 N.Y. 241, 49 N.E. 872 (1898) ("no proposition is better settled than that a statutory copyright operates to divest a party of the common law right"). So long as the original work remained unregistered and unpublished, however, the common law protected the author's rights in the work in perpetuity. See, e.g., Ferris v. Frohman, 223 U.S. 424, 434, 32 S.Ct. 263, 56 L.Ed. 492 (1912).
 
 
 30
 "The right of first publication encompasses not only the choice whether to publish at all, but also the choices when, where, and in what form first to publish a work." Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 564, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). This does not, however, allow the author to treat each publication in a new medium as a "first" publication. See, e.g., Batjac Productions, Inc. v. GoodTimes Home Video Corp., 160 F.3d at 1235 (right to control first publication "does not entail multiple first publication rights in every available medium"); cf. RCA Manufacturing Co. v. Whiteman, 114 F.2d 86, 88 (2d Cir.) (music conductor's "common-law property in [musical] performances ended with the sale of records" because those records "embodied [his] 'common-law property'--his contribution as a conductor--in precisely the same way that the record of such a score would embody his composition"), cert. denied, 311 U.S. 712, 61 S.Ct. 394, 85 L.Ed. 463 (1940). Thus, once a work is published with the author's consent in any medium, it loses its common-law protection. In sum, under the 1909 Act, "[s]tate law protection begins with a work's creation and continues until the work is 'published' " or registered, "at which point state protection is lost." Roy Export, 672 F.2d at 1101.
 
 
 31
 The 1909 Act also provides protection for copyrighted works that are incorporated in later works. Section 7 of the 1909 Act provided that
 
 
 32
 [c]ompilations or abridgments, adaptations, arrangements dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new work shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.
 
 
 33
 17 U.S.C. § 7 (repealed effective 1978) (emphasis added). Such collective works are referred to as "derivative works" in the treatises and caselaw. See, e.g., Roy Export, 672 F.2d at 1103, n. 17; Rohauer v. Killiam Shows, Inc., 551 F.2d 484, 488 n. 3 (2d Cir.) (tracing the history of statutory and caselaw protection for "derivative works"), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), called into doubt on other grounds by Stewart v. Abend, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990); M. Nimmer & D. Nimmer, Nimmer on Copyright § 4.12[A], at 4-60 to 4-61 (1997) ("Nimmer ") (citing cases); see also 1976 Act, 17 U.S.C. § 101 (defining "derivative works" consistently with that term as used in the cases). We have noted that when the author consents to the inclusion of his work in a derivative work, the publication of the derivative work, to the extent that it discloses the original work, also constitutes publication of that underlying work. See, e.g., Roy Export, 672 F.2d at 1102 ("Normally, publication of a collective work is also publication of its preexisting component works."); Nimmer § 4.12[A] at 4-60 ("any authorized publication of a derivative work must necessarily also constitute a publication of the preexisting work upon which it is based"). Thus, because "a single work cannot be protected from copying under both federal and state law at the same time," Roy Export, 672 F.2d at 1101 n. 13, where the author of a previously unpublished work consented to its inclusion in a published collection, that publication extinguished the common-law copyright in the underlying work, see, e.g., Sanga Music, Inc. v. EMI Blackwood Music, Inc., 55 F.3d at 758.
 
 
 34
 Concorde argues, however, that § 7 of the 1909 Act, in stating that the publication of a new derivative work "shall not affect the force or validity of any subsisting copyright upon the matter employed," 17 U.S.C. § 7 (repealed effective 1978), was meant to preserve the protection afforded an author under the common law. We disagree. Reading the term "subsisting copyright" in the context of the statute as a whole, we cannot conclude that that term refers to common-law rights. Although some of the cases decided around the time the 1909 Act was passed used the term "copyright" to refer not only to statutory copyright but also to common-law protection, the 1909 Act itself appeared clearly to use the term "copyright" only when it was referring to the statutory copyright. Thus, § 2, which is the only section of the 1909 Act to refer expressly to the common-law protection for unpublished works, see 17 U.S.C. § 2 ("Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, or to obtain damages therefor.") (repealed effective 1978), nowhere uses the word "copyright."
 
 
 35
 In contrast, other sections of the 1909 Act used the words "copyright" and "subsisting ... copyright" in ways that exclude the common-law right. For example, § 10 of the 1909 Act provided, in pertinent part, that "[a]ny person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title," 17 U.S.C. § 10 (repealed effective 1978) (emphasis added); and § 13 provided for certain procedures after "[c ]opyright has been secured by publication of the work with the notice of copyright," id. § 13 (repealed effective 1978) (emphasis added). Since the common-law right protected only unpublished works, the "copyright" that those sections referred to as being "secured" by publication could not refer to the common-law right. Further, if "copyright" referred to common-law rights, these provisions would, nonsensically, have provided for the "secur[ing]" (for a limited time) of a right that the owner already possessed (in perpetuity). Similarly, § 3 of the 1909 Act provided that "[t]he copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright." 17 U.S.C. § 3 (repealed effective 1978) (emphasis added). Since the common-law right in a work that remained unpublished existed in perpetuity, however, if "subsisting ... copyright" meant the common-law right, the reference to "extending [its] duration" would likewise make no sense. We conclude that the "subsisting copyright" language in § 7 of the 1909 Act refers only to statutory copyright, and not to common-law protection. Accord Batjac Productions, Inc. v. GoodTimes Home Video Corp., 160 F.3d at 1228-29.
 
 
 36
 In Batjac, the Ninth Circuit ruled that the publication of a motion picture publishes so much of the underlying screenplay as was disclosed in the motion picture. See, id. at 1225, 1236. The court reasoned that a contrary rule would turn on its head the copyright principle of limited monopoly, in that "the copyright in any film that has entered the public domain under the 1909 Act could be resurrected by an unpublished screenplay." Id. at 1233. We find this reasoning persuasive and consonant with the principles approved in our prior cases, to wit, that when the author consents to the inclusion of his work in a derivative work, the publication of the derivative work, to the extent that it discloses the original work, also constitutes publication of that underlying work. See, e.g., Roy Export, 672 F.2d at 1102. We conclude in the present case, based on the statute and the principles underlying the scope of copyright protection, that if a previously unpublished screenplay is embodied in a motion picture, so much of the screenplay as is disclosed in the motion picture is published when the motion picture is published.
 
 
 37
 This interpretation is also consistent with the longstanding approach apparently taken by the Copyright Office, that the publication of a derivative work constitutes publication of so much of the underlying work as is disclosed in the derivative work. See, e.g., Compendium of Copyright Office Practices under the 1976 Act, at § 910.04 (1984) ("The inclusion of an unpublished work in another work that is later published results in the publication of the first work to the extent that it is disclosed in the published work."); id. (Example 1) ("Where a preexisting unpublished screenplay is embodied in a motion picture, those elements of the screenplay disclosed in the motion picture are considered to be published at the same time as the motion picture is published."); 1977 Compendium of Copyright Office Practices under the 1909 Act, at § 3.1.1 IV.a. ("[p]ublication of a portion of a work does not necessarily mean that the work as a whole has been published" (emphasis added))
 
 
 38
 Although Concorde contends that the Supreme Court's decision in Stewart v. Abend, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184, constitutes "authoritative precedent" for the contrary proposition (Concorde brief on appeal at 32), Stewart is inapposite since it involved an underlying story protected by statutory copyright, not by common law. Nor are we persuaded that acceptance of Concorde's view is required by a statement in our opinion in Gilliam v. American Broadcasting Companies, 538 F.2d 14 (1976). Although a footnote in Gilliam stated that "the same principles [of § 7] with respect to derivative works adapted from material in which there is a statutory copyright also apply to material in which there is a common law copyright," 538 F.2d at 20 n. 3, that statement was, as we have previously noted, dictum, see, e.g., Roy Export, 672 F.2d at 1103, and indeed, was apparently not meant to adopt a position, for we went on to note that
 
 
 39
 [t]he law is apparently unsettled with respect to whether a broadcast of a recorded program constitutes publication of that program and the underlying script so as to divest the proprietor of the script of his common law copyright. Arguably, once the scriptwriter obtains the economic benefit of the recording and the broadcast, he has obtained all that his common law copyright was intended to secure for him; thus it would not be unfair to find that publication of the derivative work divested the script of its common law protection. On the other hand, several types of performances from scripts have been held not to constitute divestive publication, and it is unclear whether a broadcast of the recording in itself constitutes publication.
 
 
 40
 Gilliam, 538 F.2d at 20 n. 3 (internal citations omitted). And far from purporting to decide this "unsettled" issue, we expressly noted that this was a question whose resolution was neither necessary nor undertaken:
 
 
 41
 Since ABC has not objected to [the author's] assertion of common law copyright in an unpublished script, we need not entertain the question on this appeal for a preliminary injunction. We leave initial determination of this perplexing question to the district court in its determination of all the issues on the merits.
 
 
 42
 Id. (emphasis added).
 
 
 43
 The issue is squarely presented for the first time in the instant case, and we conclude, for the reasons discussed above, that the Motion Picture at issue here, which was published in 1960 and was based on the Screenplay, published the Screenplay to the extent that the Screenplay was thereby disclosed.
 
 CONCLUSION
 
 44
 We have considered all of Concorde's arguments on these appeals and have found them to be without merit. For the reasons stated above, the judgment of the district court is affirmed insofar as it denied Concorde's contract claims, and is vacated insofar as it upheld Concorde's copyright claims. The matter is remanded for further proceedings to permit the district court to, inter alia, make a comparison of the two works in order to determine the extent to which the Screenplay was disclosed in the Motion Picture and hence was unprotected after Concorde failed to renew the copyright in the Motion Picture. We express no view as to the merits of the Copyright Office's suggestion that Griffith's failure to disclose the 1960 publication of the Motion Picture on his 1982 registration application may invalidate his 1982 registration in toto.
 
 
 45
 Costs to plaintiffs.
 
 
 
 *
 Honorable Michael A. Telesca, of the United States District Court for the Western District of New York, sitting by designation