POLLAK, District Judge,
dissenting.
The Court of Appeals for the District of Columbia Circuit has recently determined, in Boehner v. McDermott, 191 F.3d 463 (D.C.Cir.1999), that the First Amendment does not bar a civil damage action brought, pursuant to 18 U.S.C. § 2511(1)(c) and 18 U.S.C. § 2520(a), and pursuant to the Florida statutory provisions that are counterparts of the federal statute, against one who, so the plaintiff alleged, gave to the Neiv York Times and other newspapers copies of a tape recording of a telephone conversation which the defendant had “knowledge and reason to know” had been unlawfully intercepted.[1] Today this court *130 holds that the First Amendment does bar a civil damage action brought, pursuant to the Federal statute and its Pennsylvania counterpart, against (1) one who handed over a copy of a taped telephone conversation to a radio reporter, and (2) the radio reporter and the two radio stations that subsequently broadcast the tape, plaintiffs having alleged that both the person who handed over the tape and the radio reporter had, in the statutory language, “reason to know” that the taped conversation had been intercepted in contravention of the federal and Pennsylvania statutes. In the case decided today the court addresses a broader range of issues then those presented in Boehner v. McDermott: in Boehner v. McDermott the only defendant was the person who allegedly delivered to the media a copy of a tape of an allegedly wrongfully intercepted telephone conversation; in today’s case there are three “media defendants” in addition to the defendant who allegedly delivered to the media a copy of a tape of an allegedly wrongfully intercepted telephone conversation.[2]
I am in general agreement with the careful analytic path traced by the court through the minefield of First Amendment precedents. However, I find myself in disagreement with the court’s ultimate application of its analysis to the case at bar.
*131 Accordingly, I respectfully dissent.[3]
I.
I agree with the court’s statement of the case. And I agree with the court’s determination that the challenged federal and Pennsylvania wiretapping statutes— here invoked by plaintiffs seeking damages for defendants’ alleged disclosure and use of a taped telephone conversation of plaintiffs that defendants allegedly had “reason to know” was the product of a prohibited “interception of a wire ... communication,” 18 U.S.C. § 2511(c); 18 Pa. Cons.Stat. § 5703(2) — are “content neutral.” I further agree with the court that the proper standard to be applied in testing the constitutionality of the federal and Pennsylvania statutes as here applied is “intermediate scrutiny.” Finally, I agree with the court that intermediate scrutiny “always encompasses some balancing of the state interest and the means used to effectuate that interest.” Op., p. 124. Concretely, such scrutiny calls for judicial assessment of whether the challenged regulation is “narrowly tailored to serve a significant governmental interest.” Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).[4]
Where I part company with the court is in its application of intermediate scrutiny in this case.
A.
The court begins by acknowledging what I take to be beyond dispute: namely, that the professed governmental interest — the interest of the United States (which is presumably also Pennsylvania’s interest) in “maintaining] the confidentiality of wire, electronic, and oral communications,” *132 Brief for the United States, p. 33 — is “a significant state interest.” Op., supra, p. 125. Then — evidently with a view to exploring whether the challenged prohibition on disclosure or use of a conversation by one who had “reason to know” that the conversation was intercepted unlawfully is “narrowly tailored to serve [that] significant governmental interest” — the court undertakes to “focus on the United States’ ... contention ... that the provisions promote privacy by eliminating the demand for intercepted materials on the part of third parties.” Op., p. 125. The court then proceeds as follows:
The connection between prohibiting third parties from using or disclosing intercepted material and preventing the initial interception is indirect at best. The United States has offered nothing other than its ipse dixit in support of its suggestion that imposing the substantial statutory damages provided by the Acts on Yocum or the media defendants will have any effect on the unknown party who intercepted the Bartnicki-Kane conversation. Nor has the United States offered any basis for us to conclude that these provisions have deterred any other would-be interceptors. Given the indirectness of the manner in which the United States claims the provisions serve its interest, we are not prepared to accept the United States’ unsupported allegation that the statute actually produces the hypothesized effect. See Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 841, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (“The Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined.”). Faced with nothing “more than assertion and conjecture,” it would be a long stretch indeed to conclude that the imposition of damages on defendants who were unconnected with the interception even “peripherally promoted” the effort to deter interception. See Village of Schaumburg, 444 U.S. at 636, 100 S.Ct. 826.
When the state seeks to effectuate legitimate state interests,
it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms. Hynes v. Mayor of Oradell, 425 U.S. at 620, 96 S.Ct. 1755; First National Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). “Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone .... ” NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (citations omitted).
Village of Schaumburg, 444 U.S. at 637, 100 S.Ct. 826.
In Village of Schaumburg, the Court stated that the Village’s legitimate interest in preventing fraud could be better served by requiring solicitors to inform the public of the uses made of their contributions, than by prohibiting solicitation. Id. Similarly, in Martin v. Struthers, 319 U.S. 141, 147-48, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), the Court held that in lieu of a complete prohibition of door-to-door solicitation, with its draconian impact on First Amendment values, the City could have used the less restrictive means of punishing those who trespass “in defiance of the previously expressed will of the occupant.” Indeed, the Wiretapping Acts already provide for punishment of the offender, i.e., the individual who intercepted the wire communication and who used or disclosed it. See Schneider, 308 U.S. at 162, 60 S.Ct. 146 (city should prevent littering by punishing litterers, not by prohibiting leafleting). Those who indirectly participated in the interception, either by aiding or abetting, would also fall within the sanctions provided by the statute. Therefore, the government’s desired effect can be reached by enforcement of existing provisions against *133 the responsible parties rather than by imposing damages on these defendants.
Op. p. 125-27.
With all respect, I find this portion of the court’s opinion unpersuasive:
First: I take issue with the proposition that “[t]he connection between prohibiting third parties from using or disclosing intercepted material and preventing the initial interception is indirect at best.” “[Preventing the initial interception” is only part of the statutory scheme. The statutory purposes, as the court has noted, are “(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized.” S.Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2153. Unauthorized interception of a communication is prohibited — and made both a criminal offense and an event giving rise to civil liability — both to protect parties to a communication from an initial trespass on their privacy and to protect them from subsequent disclosure (and/or other detrimental use). “Unless disclosure is prohibited, there will be an incentive for illegal interceptions; and unless disclosure is prohibited, the damage caused by an illegal interception will be compounded. It is not enough to prohibit disclosure only by those who conduct the unlawful eavesdropping. One would not expect them to reveal publicly the contents of the communication; if they did so they would risk incriminating themselves. It was therefore ‘essential’ for Congress to impose upon third parties, that is, upon those not responsible for the interception, a duty of non-disclosure.” Boehner v. McDermott, 191 F.3d at 470.
Second: Given the close nexus between the legislative prohibition on unauthorized interception and the legislative imposition upon “third parties, that is, upon those not responsible for the interception, [of] a duty of non-disclosure,” I am puzzled by the court’s view that the argument presented by the United States in support of the statutory regime of civil liability lacks persuasiveness because it is not supported by a demonstration that “imposing the substantial statutory damages provided by the Acts on Yocum or the media defendants will have any effect on the unknown party who intercepted the Bartnieki-Kane conversation,” or “that these [statutory] provisions have deterred any other would-be interceptors.” Nor do I think the court’s view is buttressed by the court’s invocation of Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). It is true that in Landmark, in which the Supreme Court struck down, as applied to a newspaper, a statute making it a misdemeanor to “divulge information” about confidential proceedings conducted by Virginia’s Judicial Inquiry and Review Commission, the Court observed that “[t]he Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme [which contemplated a process of confidential inquiry into alleged judicial misconduct] would be seriously undermined.” But the special — and limited-pertinence of the Court’s observation becomes clear when it is read in context. The full paragraph follows:
It can be assumed for purposes of decision that confidentiality of Commission proceedings serves legitimate state interests. The question, however, is whether these interests are sufficient to justify the encroachment on First Amendment guarantees which the imposition of criminal sanctions entails with respect to nonparticipants such as Landmark. The Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined. While not dispositive, we note that more than 40 States having similar commissions have not found it necessary to enforce confidentiality by use of criminal sanctions against nonparticipants.
*134 435 U.S. at 841, 98 S.Ct. 1535. In striking contrast is the legislative landscape that forms the setting of the case at bar. Complementing the federal statute are more than forty state wiretapping statutes. Of these state statutes, approximately half have provisions which, like the federal statute, (1) prohibit disclosure or use of an intercepted conversation by one who knows or has “reason to know” that the interception was unlawful, and (2) authorize civil damage actions against one who discloses or uses such unlawful interception. As this case illustrates, Pennsylvania is one of those states. So are Delaware and New Jersey — Pennsylvania’s Third Circuit siblings. See 11 Del. Code Ann., § 1336 (1996); N.J. Stat. Ann. §§ 2A-156-A-3; 2A-156-A-24 (West 1985 & Supp. 1999). Listed in footnote 5 are the other state statutes that closely parallel the provisions of the federal and Pennsylvania legislation challenged by defendants in the case at bar.[5]
In short, there appears to be a widespread legislative consensus that the imposition of civil liability on persons engaged in conduct of the kind attributed to these defendants is an important ingredient of a regime designed to protect the privacy of private conversations. Moreover, the decision announced today not only invalidates a portion of the federal statute and the counterpart portion of the Pennsylvania statute, it by necessary implication spells the demise of a portion of more than twenty other state statutes (and also of a statute of the District of Columbia); in the two centuries of our constitutional history there cannot have been more than a handful of prior decisions, either of a federal court or of a state court, which, in the exercise of the awesome power of judicial review, have cut so wide a swath.
Third: What has been said points up the non-pertinence to the case at bar of Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), and Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), cases cited by the court as illustrative of the proposition that regulations designed to promote significant governmental interests should not sweep so broadly as to impose unnecessary constraints on First Amendment rights of free expression and communication. The constitutional shortcomings in Schneider (combating the littering of streets by curbing leafleting), Struthers (banning door-to-door distribution of circulars, including religious literature, in order to protect homeowners from annoyance), and Village of Schaumburg (combating allegedly fraudulent charitable solicitation by banning all solicitation by groups not disbursing 75% of receipts) involved situations in which small towns imposed on traditional First Amendment activities pervasive constraints sought to be justified as ways of dealing with distinct (and not very important) problems that could have been more effectively addressed by governmental action directed at the actual problems — e.g., prosecuting litterers (Schneider); prosecuting as trespassers solicitors who do not depart when requested by homeowners to do so (Struthers); requiring organizations soliciting contributions to disclose how receipts are used (Village of Schaumburg). In the case at bar, unauthorized disclosure (or other use) of private conversations is a central aspect of the very evil the chal *135 lenged statutory provisions are designed to combat.
B.
The court also notes that “[reporters often will not know the precise origins of information they receive from witnesses and other sources, nor whether the information stems from a lawful source,” or, indeed, “whether material they are considering publishing has previously been disclosed to the public.” Op., p. 127, As a result, the court opines, “[i]t is likely that in many instances these [challenged statutory] provisions will deter the media from publishing even material that may lawfully be disclosed under the Wiretapping Acts.” Ibid.
I think the court overstates the potential problems of the media. One would suppose that a responsible journalist — whether press or broadcast — would be unlikely to propose publication of a transcript of an apparently newsworthy conversation without some effort to insure that the conversation in fact took place and to authenticate the identities of the parties to the conversation. As part of such an inquiry, the question whether the parties to the conversation had authorized its recording and release, or whether others had lawfully intercepted the conversation, would seem naturally to arise. Moreover, current technology would make it relatively easy to determine whether the conversation had been the subject of a prior press or broadcast report.[6]
In my judgment, a more substantial First Amendment difficulty is posed by the fact that the person or entity charged with knowing or having “reason to know” that a published conversation was unlawfully intercepted is called on to contest before a judicial fact-finder (whether jury or judge) a plaintiffs allegation of knowledge or “reason to know.” But the difficulties attendant on fact-finder oversight of journalistic practice (or, indeed, of public disclosure by non-journalists) can, I believe, be met by adoption of the procedural proposals advanced in the brief for the United States:
In criminal prosecutions under Title III, scienter must be proved beyond a reasonable doubt. In civil cases scienter ordinarily would be subject to a conventional preponderance-of-the-evidence standard. When a claim is brought for disclosure of information about matters of public significance by persons who were not involved in the illegal interception, however, a preponderance-of-the-evidence standard may operate to deter the publication of information that was not the product of illegal surveillance. To avoid that result, it might prove appropriate for district courts to impose a higher standard of proof of scienter in such cases, such as proof by. “clear and convincing” evidence, and for appellate courts to conduct independent review of the findings of the trier of fact. Cf. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (requiring clear and convincing evidence of “actual malice” in defamation cases); Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. *136 485, 498-511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (de novo appellate review of findings regarding actual malice). See generally Waters v. Churchill, 511 U.S. 661, 669-71, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) (discussing circumstances in which First Amendment requires modifications of burdens of proof and other procedural rules).
Brief for the United States, pp. 40-41 n. 8.[7]
II.
As the court’s opinion makes plain, the First Amendment values of free speech and press are among the values most cherished in the American social order. Maintenance of these values (and the other values of the Bill of Rights) against overreaching by the legislature or the executive is among the judiciary’s major and most demanding responsibilities. In the case at bar, however, the First Amendment values on which defendants take their stand are countered by privacy values sought to be advanced by Congress and the Pennsylvania General Assembly that are of comparable — indeed kindred— dimension. Three decades ago the late Chief Judge Fuld of the New York Court of Appeals put the matter well in Estate of Hemingway v. Random House, 23 N.Y.2d 341, 348, 296 N.Y.S.2d 771, 244 N.E.2d 250, 255 (1968) (in words that the Supreme Court has quoted with approval, Harper & Row Publishers v. Nation Enterprises, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)):
The essential thrust of the First Amendment is to prohibit improper restraints on the voltmtary public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet. There is necessarily, and within suitably defined areas, a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.

. In Boehner v. McDermott, the plaintiff, John Boehner, is a Republican Representative who, together with other members of the Republican leadership of the House of Representatives (including then Speaker Gingrich), was in 1996 party to a conference telephone call *130 that was unlawfully intercepted by persons equipped with a radio scanner. According to Representative Boehner’s complaint, the interceptors turned over the tape to James A. McDermott, a Democratic Representative who was at the time the ranking minority member of the House Ethics Committee; Representative McDermott in turn gave copies of the tape to the New York Times and other newspapers; and the New York Times promptly published part of the taped conversation. Representative Boehner sued Representative McDermott, but did not sue the New York Times or any other newspaper. The district court dismissed Representative Boehner's complaint on First Amendment grounds. The circuit court reversed.
The circuit court perceived a potentially important distinction between Representative McDermott’s First Amendment claim and the First Amendment claim that might have been made by the New York Times or another newspaper, if a newspaper had been named as a defendant. Identifying that potential distinction, the court was at pains to confine its analysis to Representative McDermott's claim:
McDermott’s liability under § 2511 (l)(c) rests on the truth of two allegations: that he “caused a copy of the tape” to be given to the newspapers; and that he "did so intentionally and with knowledge and reason to know that the recorded phone conversation had been illegally intercepted (as the cover letter on its face disclosed).” Complaint ¶ 20. Although the circumstances of McDermott’s transactions with the newspapers, including who said what to whom, may become evidence at trial, it is his conduct in delivering the tape that gives rise to his potential liability under § 2511(l)(c). McDermott's behavior in turning over the tapes doubtless conveyed a message, expressing something about him. All behavior does. But not all behavior comes within the First Amendment.
“[E]ven on the assumption that there was[some] communicative element in” McDermott's conduct, the Supreme Court has held that “when 'speech' and 'non-speech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.” United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The O'Brien framework is the proper mode of First Amendment analysis in this case. McDermott's challenge is only to the statute as it applies to his delivery of the tape to newspapers. Whether a different analysis would govern if, for instance, McDermott violated § 2511(1)(c) by reading a transcript of the tape in a news conference, is therefore a question not presented here. Nor should we be concerned with whether § 2511(1)(c) would be constitutional as applied to the newspapers who published the initial stories about the illegally-intercepted conference call. The focus must be on McDermott's activity and on his activity alone.
191 F.3d at 467.
The author of the court's opinion was Judge Randolph. Judge Ginsburg filed a concurring opinion, joining part (including the paragraphs just quoted) of Judge Randolph's opinion. Judge Santelle filed a dissenting opinion.

. The Boehner v. McDermott court was at pains to point out the limited scope of its ruling. See note 1, supra. See also note 3, infra.

. Although I have expressed general agreement with the court's analytic approach. I should note one aspect of the analysis on which I differ with the court. That aspect is cogently illustrated by the distinction the Boehner v. McDermott court drew between the First Amendment posture of Representative McDermott and the potential First Amendment posture of a newspaper that published (as the New York Times in fact did) a portion of the intercepted telephone conference call, had such a newspaper been sued. As the Boehner v. McDermott excerpt quoted in footnote 1, supra, makes clear, the court was doubtful that Representative McDermott's action in giving copies of the tape to newspapers was itself "speech” in the full First Amendment sense. Judge Randolph, speaking for the court, saw Representative McDermott's First Amendment claim as cabined by the Supreme Court's holding in United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.”
In the case at bar, in which the plaintiffs have sued both Yocum and media defendants, the United States argues that the approach reflected in O'Brien and cases that follow it is appropriate to the entire case. The court rejects that view. I find the Boehner v. McDermott exposition of Representative McDermott's limited First Amendment posture persuasive, and thus in the case at bar I would apply the O'Brien approach to defendant Yocum — whose role, from a First Amendment perspective, seems analogous to that of Representative McDermott — while rejecting O'Brien as the proper approach to the First Amendment claims of the media defendants. However, the distinction is not one that I need pursue, because, accepting for the purposes of the case at bar the court’s comprehensive rejection of O’Brien, I nonetheless wind up disagreeing with the court on how the court's analytic approach plays out as applied, with the result that I conclude that liability in damages could constitutionally have been imposed both on Yocum and on the media defendants if the plaintiffs had been permitted to take their case to trial and had proved their allegations to the satisfaction of the fact-finder.

. The other criterion identified in Clark v. Community for Creative Non-Violence — namely, whether the challenged regulation "leave[sj open ample alternative channels for communication of the information” 468 U.S. at 293, 104 S.Ct. 3065 — is not pertinent to the case at bar because the challenged statutes are not, as the challenged regulations in Clark v. Community for Creative Non-Violence were deemed to be, "time, place or manner restrictions.” Ibid. And see id. at 295, 104 S.Ct. 3065.

. Fla. Stat. Ann. §§ 934.03, 812.15; Haw. Rev.Stat. §§ 803-42(a)(3), 803-48; Idaho Code §§ 18-6702, 18-6709; 720 Ill. Comp. Stat. Ann. 5/14-2, 5/14-6; Iowa Code §§ 808B.2(1)(c), 808B.8; La.Rev.Stat. Ann. §§ 15:1303 A(3), 15:1312; Md.Code Ann. §§ 10-402(a)(2), 10-410; Mich. Comp. Laws Ann. §§ 750.539e, 750.539h; Minn.Stat. Ann. §§ 626A.02(c), 626A.13; Neb.Rev.Stat. §§ 86-702; N.H.Rev.Stat. Ann. §§ 570-A:2, 570-A:ll; N.C. Gen.Stat. §§ 15A-287, 15A-296; Ohio Rev.Code Ann. §§ 2933.52, 2933.65; Tenn.Code Ann. §§ 39-13-601, 39-13-603; Utah Code Ann. §§ 77-23a-4, 77-23a-11; Va. Code Ann. §§ 19.2-62, 19.2-69; W. Va.Code §§ 62-1D-3, 62-1D-12; Wis. Stat. § 968.31; Wyo. Stat. Ann. §§ 7-3-602, 7-3-609; See also D.C.Code Ann. §§ 23-542, 23-554.

. On occasion, inquiry of the kind suggested might indeed take a few days. But news reporting — especially with respect to events (such as a conversation) that are concluded, rather than still evolving — need not be an instant process. In the case at bar, it appears that defendant Vopper did not broadcast the conversation until some months after defendant Yocum gave him a copy of the tape. Deposition of Frederick W. Vopper, App. 60a-61a. On the other hand, the New York Times published a portion of the intercepted conversation that gave rise to Boehner v. McDermott the day after it received the tape. The New York Times story also reported that the tape had been "made ... available to the New York Times” by "a Democratic Congressman hostile to Mr. Gingrich who insisted that he not be identified further” and who told the Times that the tape had been given to him [on January 8, 1997] by a couple who said the tape "had been recorded [on December 21, 1996] off a radio scanner, suggesting that one participant was using a cellular telephone.” N.Y. Times, January 10, 1997, p. 1, col.3.

. The court's decision has the anomalous consequence of cloaking Yocum, who is not a “media defendant”, with the First Amendment protections the court deems appropriate for radio reporter Vopper and the two radio stations. I have undertaken to explain in footnote 3, supra, that in my judgment Yocum has a far more tenuous First Amendment claim (if any) than the media defendants. I do not think that, merely by virtue of the fortuity that the plaintiffs have elected to sue Yocum and the media defendants (which the plaintiff in Boehner v. McDermott did not do), Yocum becomes a third-party beneficiary of whatever First Amendment protections may accrue to the media defendants.